F. P. HOWARD, Respondent (and Appellant), v. ADAM SCOTT and R. A. MOONEYHAM, Appellants (and Respondents).

Two Cases, Nos. 14,203 and 14,204; Cross-Appeals and Cases Consolidated.

Division One, March 1, 1910.

1. SETTING ASIDE JUDGMENT: Statutory Proceeding or Equitable. Where the petition is neither entitled nor filed in the original partition suit, but the suit is a separate proceeding brought by the defendant against the plaintiff in that and his purchaser after decree in his favor and partition sale, and the petition does not ask to have the judgment in that opened, but the relief sought is to have that judgment and the commissioners' report and its approval and the subsequent deed swept away, as the product of fraud, and to re-establish plaintiff's title out-and-out, the suit is not a statutory review of the judgment, such as is provided for by Secs. 777 to 784, R. S. 1899, but an original case in equity, and plaintiff can get only such relief as equity allows.

2. PLEADING: Fraud: General Charge. A petition charging fraud in general terms, and with some particularity, but not with such strictness and fulness as might be, will be held sufficient after judgment, there being no timely motion to make more specific or other objection at the trial.

3. FRAUDULENT JUDGMENTS: Grounds For Setting Aside: Newspaper Notice. False swearing and false averments in pleadings are not grounds for an action in equity to set aside a judgment for fraud; but to sustain such an action, there must be some fraud committed on the court itself in the procurement of the judgment, arising extrinsically or collaterally to the is-

sue tried, or on the party' himself, arising in the same way. But LAMM, J., inclines strongly to the view that the strictness of this doctrine should be applied only in those cases where there was service of process, actual notice of the suit, or appearance, and not be strictly or mechanically applied to judgments obtained on mere newspaper notice where defendants knew nothing of the pendency of the suit.

4. ———: ———: Betrayal of Court's Jurisdiction: Discharge in Bankruptcy: Suit to Establish Concealed Claim. Fraud is not to be defined by hard-and-fast rules. Courts do not undertake to point out and define the particular frauds that will vitiate judgments. Nevertheless a lying allegation in a petition and false swearing, when accompanied by collateral and extrinsic facts, which, when taken together, result in a judgment, in a suit brought by newspaper notice, of which defendant had no actual notice, may constitute such a betrayal of the court's jurisdiction as to demand a vacation of the judgment as having been fraudulently obtained. So that where defendant had bought land and given his notes secured by a deed of trust in payment, and then sold a half interest to plaintiff, who in his deed assumed the payment of one-half the debt, and plaintiff took up the notes and had them indorsed to him, and then, without notice to defendant, had the trustee foreclose the deed of trust, and through an intermediary bought in the land, and had his bid, which amounted to less than half the amount of one of the three equal notes, credited on one of them, and defendant, then in voluntary bankruptcy, scheduled his property and omitted any reference to any interest in the land, and piled oath upon oath that he had revealed all his property, and stood by and saw plaintiff obtain, without objection, an allowance of one-half the unpaid notes as an unsecured claim, and, having obtained the complete discharge of his debt, thereby, if he had any valid interest in the land, working a fraud upon the court, the trustee in bankruptcy and all his creditors, especially plaintiff, a judgment thereafter obtained by him against plaintiff upon a newspaper notice, without actual notice or an appearance, in a partition suit, brought while the bankruptcy proceeding was still pending, in which he alleged and testified that he had, prior to the foreclosure sale, fully paid one-half of the mortgage debt to plaintiff and plaintiff had paid the whole, and by which the foreclosure sale was decreed void and set aside and one-half the land vested in defendant, and in the trial of which he concealed from the State court the matters concealed in the Federal court, was a fraud on both courts, and on the plaintiff and other creditors, and especially on the State court, and should be set aside in a direct suit in equity alleging fraud.

5. ———: ———: Permitting Defendant to Redeem: Pleading. A defendant should not be permitted to redeem land sold under

a deed of trust without asking to redeem. A decree must be within and not broader than the pleadings. Where plaintiff brings suit to have a judgment set aside decreeing the plaintiff and defendant to be cotenants in land and setting aside a foreclosure sale, and defendant pleads that the debt had been paid and plaintiff had bought in the land at a foreclosure sale knowing it had been paid, and fails in that defense of payment, and the judgment is set aside as fraudulent, defendant, with no prayer to redeem, is not entitled to have the lien of the deed of trust reinstated and his half of the deed made a valid lien on the land, and that part of the prior judgment which set aside the foreclosure sale and the trustee's deed affirmed; for those things were not embraced within his answer. Besides, he was in no position to redeem because his equitable interest and title in the land was at the time in the trustee in bankruptcy.

6. ———: ———: **Innocent Purchaser.** An attorney who acquired the interest of his client under a judgment which must be set aside as a fraud upon the court, is chargeable with all information that inquiry, diligently pursued, would give him; and if it is apparent that such inquiry would have revealed to him that the judgment was void and that the title to the land was in the trustee in bankruptcy, his deed from his client must also be set aside.

Appeal from Jasper Circuit Court.—*Hon. Hugh Dabbs,* Judge.

AFFIRMED AS TO SCOTT AND MOONEYHAM, APPELLANTS;

REVERSED AND REMANDED (*with directions*) AS TO APPELLANT HOWARD.

*Mooneyham & McCawley, E. O. Brown* and *H. W. Currey* for appellants Scott and Mooneyham.

(1) A petition attacking a judgment as having been procured by fraud should point out in what particulars the alleged fraud was committed, or the specific acts wherein fraud in the procurement of such judgment is alleged to exist. Unless the petition does so state, no cause of action for setting aside the judgment is stated. Nagel v. Railroad, 167 Mo. 89. The allegations of fraud in the procurement of the judgment sought to be set aside in the present case, as having been obtained by fraud, are not of such char-

acter as to justify the court in setting aside the judgment. Martin v. Castle, 193 Mo. 183; Burnham v. Boyd, 167 Mo. 185; Nichols v. Stephens, 123 Mo. 96; McGridley·v. Newton, 75 Mo. 115; Smith v. Simms, 77 Mo. 269. (2) There was no fraud in Scott's failing to advise the court of his bankruptcy, nor in omitting from his schedule of assets any mention of his right of action to set aside the trustee's sale. Culson v. Ferree, 82 S. W. 1000. The entire record is barren of any testimony tending to show that Scott was guilty of any word, act or deed calculated to defraud Howard. On the contrary, Scott stands with clean hands, four-square to every wind of legal criticism that can legitimately blow, and altogether *rectus in curia*. So that the judgment in the case of Scott v. Howard cannot be successfully assailed on account of fraud in its procurement. The evidence introduced did not warrant the finding of the court below that fraud had been practiced by Scott in procuring the judgment setting aside the trustee's sale and partitioning the real estate in controversy. According to Howard's own showing Scott acted throughout in the open, adopting the usual and customary methods, without resorting to any sharp practice or underhanded methods whatever. The plaintiff's bill, therefore, should be dismissed. This being a proceeding in equity the evidence is reviewable by this court as upon a first impression. Goodin v. Goodin, 172 Mo. 48. The special finding of facts by the trial court is, therefore, not binding on this court. Sec. 695, R. S. 1899, relating to special finding of facts, was not intended to cover, and does not have any effect on, the power or duty of appellate courts in equity cases. Shaffer v. Detie, 191 Mo. 377. (3) In this class of cases the plaintiff must in his petition state facts showing that he occupies a status entitling him to assail the judgment; that he himself is an existing creditor, or that he occupies a representative capacity which gives him the right, in behalf of other creditors,

to sue. Sawyer v. Harrison, 43 Minn. 297; Cunningham v. Williams, 42 Ark. 170; Uhre v. Melum, 17 Ill. App. 182; Brayley v. Buyrnes, 20 Minn. 435; Burton v. Platin, 53 Fed. Rep. 901. Although Scott's right of action to set aside the trustee's sale under the Hayden deed of trust may have passed to his assignee in bankruptcy, and the former had no right to further prosecute his suit against Howard (which we deny), yet this was a matter of defense, and if Howard desired the court to act upon this fact, it was his duty to set it up by answer in the case of Scott v. Howard. Scott's discharge in bankruptcy took Howard out of the category of creditors. The latter, therefore, has no standing to maintain this suit. Imhoff v. Whittle, 81 S. W. 814; Wood v. Baker, 60 Hun 337. After the bankrupt's discharge whatever is left in the trustee's hands becomes the property of the bankrupt by operation of law without any formal retransfer, and the bankrupt is the proper party to sue for whatever is left in the trustee's hands at the time of his discharge. Parry v. Carnes, 86 Mo. 652. It is uniformly held that where the trustee does not assert his right in the premises the bankrupt may proceed with the action. Thatcher v. Rockwell, 105 U. S. 467; Connor v. Southern Ex. Co., 42 Ga. 37; Lansey v. Foss, 88 Me. 215; Reed v. Paul, 131 Mass. 129; Tolle v. Rowe, 15 N. H. 394. Even though Scott's naked right to bring a suit in equity to set aside the trustee's sale under the Hayden deed of trust was of such a character that it passed to his trustee in bankruptcy (which we deny), the trustee having failed to assert any claim thereto before his discharge, the right in question remained the property of Scott, and he alone is the proper party to sue therefor in his own name. Connor v. Exchange Co., 42 Ga. 37; Sessions v. Romadka, 145 U. S. 29; Brandenburg on Bankruptcy, p. 782; Beal v. Dushane, 24 Atl. 284; Glenny v. Langdon, 98 U. S. 20; Taylor v. Irwin, 20 Fed. 615. (4) Scott's right to bring an ac-

225 Sup—44

tion in equity to set aside the trustee's sale under the Hayden deed of trust, on the ground of fraud, was neither assignable nor subject to sale on execution, and, therefore, did not pass to his trustee in bankruptcy. Jones v. Babcock, 15 Mo. App. 149; Harrison v. Craven, 188 Mo. 590; Whitney v. Kelley, 49 Cal. 146; Gruber v. Baker, 23 Pac. 858; Sanborn v. Doe, 92 Cal. 152; Annis v. Butterfield, 58 Atl. 898; In re LeClaire, 124 Fed. 654; Berustin, 131 Fed. 831. The trustee's sale being voidable, and not void, the right to avoid is not an assignable chose in action. (5) Apart from every other consideration, plaintiff, under the undisputed facts developed at the trial, is not entitled to the aid of a court in equity, to invalidate the judgment in question. Plaintiff's conduct in seeking to defraud Scott of his interest in the land, through a pretended trustee's sale, precludes him from seeking redress in a court of conscience. Every turn of the wheel in Howard's manipulation of this matter bears the impress and earmarks of ill-disguised and unmistakable fraud. Steckman v. Harber, 55 Mo. App. 71. Moreover, Howard, having assumed and agreed to pay one-half of the mortgage indebtedness, became the principal debtor as to the portion so assumed, so that the payment to Hayden operated to extinguish the mortgage indebtedness. Again, the money paid by plaintiff in taking up the Hayden notes was a voluntary payment pure and simple, made before the maturity of the notes and not at the request or instance of the holder thereof, nor was such payment necessary to protect plaintiff's interests in the mortgaged property; hence, there can be no lien for such payment. It would be intolerable to allow one person without authority to pay the debt of another and charge the amount so paid to the party for whom the payment was made. Smith v. Stephens, 164 Mo. 415; Allen, Admr., v. Collins, 41 Mo. 302; Bunn v. Lindsay, 95 Mo. 250; Nelson v. Brown, 140 Mo. 580.

*Thomas & Hackney* for respondent Howard.

(1) The petition filed by the plaintiff in this action contains all the elements of, and may be regarded as, a petition for review under the statute. Secs. 777-780, R. S. 1899; Badgley v. Sligo Furnace Co., 120 Mo. 248. (2) But, treating this purely as a proceeding in equity to annul and vacate the fraudulent decree and partition proceeding in the case instituted by Scott against Howard, the facts disclosed in evidence fully warrant the cancellation and vacating of this fraudulent decree and proceeding by a court of equity, on the ground of fraud in procuring the judgment, for these reasons: First. Scott had been adjudged a bankrupt in a voluntary proceeding in bankruptcy, which bankruptcy proceeding was pending at the time of the filing of his petition against Howard. The trustee in bankruptcy, therefore, became the owner of whatever interest Scott might have in the property, and notwithstanding this fact Scott fraudulently concealed from the circuit court in which he filed his fraudulent petition the fact of his bankruptcy proceeding, and fraudulently concealed from said court the rights of the trustee in bankruptcy to the property if the trustee's sale was invalid. Had this fact been disclosed to the court, it would have refused to entertain Scott's petition and would have dismissed the case. Second. Scott knew that Howard was in the peaceable possession of the real estate claiming to own the whole; that Howard lived at Decatur, Illinois; and he fraudulently concealed from Howard the fact that he, Scott, was making any claim to the land, and caused this proceeding to be had without actual notice to Howard. Third. Scott deliberately committed perjury on the hearing of his fraudulent petition before the circuit court, in testifying that he had paid Howard the full one-half of the Hayden mortgage, when he knew that he had not made such payment. Fourth. The presentation to the court of this fraudulent claim to

the property by Scott, and the commission of perjury by him to obtain the fraudulent decree, took place in the absence of Howard when he had no opportunity to cross-examine the witnesses nor to reveal to the court the truth, showing the falsity of Scott's claim and the falsity of his testimony. A court of equity has ample power to cancel and vacate as fraudulent a judgment or decree obtained under such circumstances. Wonderly v. Lafayette Co., 150 Mo. 635; Fitzpatrick v. Stephens, 114 Mo. 497; Irvine v. Leyh, 102 Mo. 200; Mayberry v. McClurg, 51 Mo. 256; Miles v. Jones, 28 Mo. 87. Wherever a fraudulent cause of action is stated in the petition and perjury is committed on the trial of this fraudulent claim, in a case where the defendant has no actual notice of the pendency of this action and has no opportunity to reveal to the trial court the falsity of the plaintiff's claim, a court of equity has the power to set aside the judgment as being obtained by fraud. (3) It was manifest error in the trial court to set aside the trustee's sale and permit the defendant Scott to redeem from the mortgage. This branch of the decree of the court is unsupported either by the pleadings in the cause or by the evidence. The answer of neither of the defendants charged any fraud, misconduct or invalidity in the foreclosure of said deed of trust, and neither asked that the sale by the sheriff, acting as trustee, be set aside. No offer to pay the amount due is made in either answer. No offer to redeem and no prayer to redeem. Schneider v. Patton, 175 Mo. 684; Roden v. Helm, 192 Mo. 71.

LAMM, P. J.—From a decree in the Jasper Circuit Court affecting land, both parties appealed to the Kansas City Court of Appeals, the appeals coming to this court from that on the theory title to real estate was involved in the judgment.

In a pinch, in court or out, much is seen through

a key-hole, or, put otherwise, some one illuminating fact often throws a gleam of light into the obscure corners of litigation to aid the eye of a chancellor precisely as a flash of lightning on a dark night reveals the landscape to a bewildered traveler. The wise Latin hath it that every living thing comes from a germ (*omne vivum ex ovo*)—which, broadly, may be put into: Every lawsuit is hatched from an egg or grows from a seed. If such commonplace generalities are allowable as a foreword to this case, involving charges and countercharges of perjury and fraud, they may be rounded with a bit of record to find the egg of the case, viz.:

One Smith of Oronogo met defendant Scott at the Joplin railroad station in January, 1904—Scott then being in the thrall and throes of bankruptcy on his own petition. Now, Smith was a real estate agent, who, under this record, must have had an alert eye, if not a receptive palm, for a dollar. Did Opportunity in that behalf knock at Smith's door? Then, either the latch string hung out for a "come in!" or opens Smith at once. Scott had fished in the troubled waters of speculation in mines and mining, at some time meeting up with Howard. The latter had journeyed from Decatur, Illinois, and was sojourning in Jasper county to mend his fortune. Betimes it fell out that the twain, Howard and Scott, became tenants in common in the land in suit, a farm of 137 acres hard by said Oronogo —further, that said Smith once had charge of it as agent for the two. So, meeting Scott by chance on a winter's day, he took time by the forelock, and, assuming the title to the farm stood in the two, accosted Scott thus (quoting): "Do you want to sell—do you and Howard? I got a buyer." Then this (still quoting from Smith's evidence): "He says, 'That damned rascal stole that from me,' and I says, 'Who?' and he says, 'Howard,' and I says, 'There is a way to bring thieves to justice if that is the way about it. One

partner can't do another that way,' and he says, 'How will I help myself?' and I says, '*Give me half I get out of it and I will show you how to help yourself.*'"
Presently Scott, on January 29, 1904, so moved thereunto by Smith, contracts in writing for Smith to employ attorneys, bring a lawsuit and "to do and perform all things necessary" to recover Scott's land—going halves in the gain. Presently Smith, pursuant (being no "licensed lawyer"), contracts with Mr. Mooneyham (who is one) to divide his half with Mooneyham and then the mill of justice is set grinding and no stone is left unturned to "show" Scott as per contract. So much as introductory.

But to begin at the beginning to unravel the tangled threads of an uncommonly complicated record. In 1897 or thereabouts Scott, with one Maris and plaintiff, Howard, were partners in developing, exploiting and working mines and mining properties in Jasper county—only one, the "Little Nugget," or "Sacred Nugget," becoming a paying proposition. We deem the testimony, of which there is a great deal, relating to the various contracts anent the "Little Nugget" and the other mines, the outlays and incomes, profits and losses thereof, and the ultimate sale of the "Little Nugget" as throwing little or no light on the case to be decided. This testimony will therefore be omitted. Suffice to say that at a certain time the "Little Nugget" was sold and on winding up the mining ventures and the partnership of Scott, Howard and Maris, it resulted that Scott owed Howard $2816.28. There was a dispute between them. They fell out and went to law. Their respective partnership claims and counterclaims were threshed over before a referee. Presently in 1901 it was found that Scott owed Howard the above amount, afterwards merged in judgment, which, on appeal to the Kansas City Court of Appeals, was affirmed. [98 Mo. App. 509.] That suit ran for three or four years and will be called "suit A."

Afterwards in another suit (the suit brought under the Smith and Scott contract hereinbefore mentioned) it was claimed by Scott that Howard owed him in and about these mining transactions a certain sum of money which, when account was taken thereof, resulted in showing that on a fair settlement between them Scott had furnished his entire *pro rata* share in buying the land in dispute. But the testimony fails to show such fact and we dismiss the matter by saying that the partnership accounts were litigated, and Scott was adjudged indebted to Howard in the judgment in "suit A."

Going back a little. In January, 1898, Scott took an option on the land in suit (137 acres), viz., all of the southeast quarter of section 30, township 29, range 32, in Jasper county, Missouri, except thirty acres in the northeast corner—paying ten dollars to Hayden, then owner, for the option. The purchase price was $4785 and the payments were to be: One-fourth down and three-fourths deferred, to be evidenced by notes due in one, two and three years in equal amounts, at eight per cent, secured on the property. The land was a farm and used as such. It may have had a prospective value as mineral land but no attempt was made to explore it for mineral. Presently, before the option expired, Howard agreed to take a half interest in the farm. To that end he drew a check in favor of Scott for $1186.25 to complete the cash payment, and Scott indorsed the check over to Hayden, who, in turn, cashed the same for the payment in hand. The transaction was closed in this way: Hayden conveyed the land to Scott, took back from him a deed of trust securing the notes evidencing the deferred payments— said notes signed by Scott and wife. One Manker was made trustee. This deed of trust and the warranty deed to Scott being spread of record, straightway Scott and wife conveyed an undivided half interest

to Howard on the expressed consideration of $2400—
the deed having the following clause: "This is subject
to a mortgage in favor of T. C. Hayden for the sum
of $3586.75." There is some loose and inconclusive
talk in the record that Scott and Howard were "part-
ners" in this farm. But the farm did not become part
of the assets of any partnership and was not treated
as such. They were tenants in common, with all that
implies, and when these deeds were put of record early
in 1898 Scott had in the land $10 and Howard $1186.25
—all subject to the debt for the balance of the purchase
money, $3588.75. Presently, as between Scott and
Howard, the cash payment was arranged in this way:
Scott gave Howard a note for his half due in one
year at eight per cent. Things ran on and Scott col-
lected some rent and paid one year's interest on the
deferred payments. Howard collected some rent and
paid an attorney's fee. On April 10, 1899, Howard
and Scott struck a balance on the farm transaction
and Scott took up his note for the one-half on the
cash payment, so that, on the close of that settlement,
they had paid an equal amount of cash on the land
and held it subject to the mortgage for the deferred
payment. Notes for the deferred payments were pay-
able "on or before."

At some time shortly before August 13, 1900,
Howard went to Hayden, paid him the full amount
of the three notes given by Scott and wife for the
deferred payments on the land and took over the
notes, each indorsed thus: "Pay to the order of F. P.
Howard without recourse." Signed, "T. C. Hayden,
trustee." It seems the notes bore a prior indorsement
from Hayden as payee to "T. C. Hayden, trustee for
Ernest Webb estate." The amount of the notes at
that time was $3736.30—the first note was due, the
last two were not due. Howard and Scott were "at
outs" and then litigating over their mining differences.

Howard either bought these notes with the intention
of foreclosing the deed of trust, expecting thereby to
cut away Scott's title in the land as tenant in common,
or to dissolve all connection with him by a sale.
Hayden did not care to sell the notes, but Howard
pointed to the fact that they were payable "on or
before" due, and Hayden either assumed that Howard
had the right to pay, and took it for granted that
Howard was paying them, or else Howard told him
he was paying the notes off by virtue of his legal
right to do so because of his interest in the land in
connection with Scott. Howard, however, testified
that he bought the notes out-and-out and that
the transaction was no payment. There can be no
doubt that he did not intend to pay the notes on the
theory that he was bound to pay, *i. e.,* that he owed
them all. The indorsements of Hayden negatives such
notion, but there can be little doubt that he was willing
to leave Hayden under the impression that he had the
right to take up the notes. Hayden says his indorse-
ment was for the purpose of allowing Howard to re-
lease the record. Howard denies this. Presently How-
ard went to the trustee, Manker, who was Hayden's
near relative, to get a foreclosure. Manker refused to
serve—why is dark—and put his refusal in writing.
Thereupon Howard procured the sheriff to act as
trustee under a clause in the trust deed providing
for that emergency. Presently the sheriff advertised.
It seems Scott then resided in Joplin. The deed of
trust required an advertisement in some newspaper
published in Jasper county. There were newspapers
so published in Joplin, in Webb City, in Carthage,
one or more in Oronogo and one at a town called
Sarcoxie. Oronogo was about a mile from the land;
Webb City, say, three or four; Carthage, ten; Joplin
either less or a little more; while Sarcoxie is nigh
twenty-eight or thirty miles away. Further, Oronogo
is in a "mineral" district and the region about Sar-

coxie is "strawberry" land—that is, it is devoted to exploiting that respectable berry which alone is likened unto angling for good qualities. Witness what the chief of the whole anglers' tribe, rare and pious old Izaak Walton, said centuries ago, viz.: "We may say of angling as Doctor Boteler said of strawberries: 'Doubtless God could have made a better berry, but doubtless God never did;' and so, if I might be judge, God never did make a more calm, quiet, innocent recreation than angling." (*The Compleat Angler*, pt. *I*, chap. *V*.) But this is a little afield. The newspaper doing the advertising was the "Sarcoxie Siftings." There is no testimony it was devoted only to strawberries and likely to be read by no one save strawberry people, nor do we see the extent of its circulation. Smith testified he lived at Oronogo and never saw a copy of it, but his reading taste and the extent of his reading are dark. It stands conceded, however, that the "Sarcoxie Siftings" is published in a village as far away as possible from the land and yet be in Jasper county.

On October 8, 1900, the sheriff as acting trustee made the sale, presumably at the place required by the deed of trust. One O'Donnell bought on a bid of $485 and a deed to him followed. The advertisement was to the effect that the trustee would sell the undivided half interest in the land owned by Adam Scott, the grantee in the deed of trust, and further set forth that the other undivided interest had been conveyed by said Scott and wife to Howard. It stands conceded that O'Donnell was representing Howard at the sale and that the trustee's deed conveyed the interest advertised. He received fifteen dollars for his services and immediately quitclaimed to Howard for an express consideration of $500. Howard at once took possession and by his tenants held possession at the time Smith, in Scott's name, brought suit under the contract we have mentioned. At the date of sale the

interest on the note due, together with its principal, was $1360. Deducting O'Donnell's bid, less the costs of the sale, leaves the balance on that note $873. The situation at the time was this: Howard had the legal title to the land and held one note against Scott then due for a balance of $873 and two notes not yet due each for $1196.25, dated January 22, 1898, drawing eight per cent interest, and on both of which the interest was paid to January 22, 1899.

The suit brought in Scott's name by Smith against Howard contemplated setting aside this sale for fraud, and the theory of that case will be developed with particularity a little farther along. Before we come to that suit, another court proceeding demands attention in order to preserve the march of events in due order of time.

Scott knew nothing of the foreclosure at the time, but finally became aware of it. In a casual way he asked street opinions of lawyers about the sale, but got no encouragement. The truth is his financial affairs had run at loose ends and were in a desperate fix. He was much involved in debt and litigation, and, we take it, was entirely dissatisfied with his counsel's management of his lawsuits, so that whether from distrust of courts or lawyers or for other reasons, he acquiesced in the foreclosure for the time. That foreclosure was followed by judgment in "suit A," in 1901, already mentioned. Presently after the judgment in that case was affirmed he concluded to surrender all his property, except the strict exemptions allowed by law, and in turn to get acquit of all his debts. To this end, on July 8, 1903, he filed a petition in the district court of the Southwestern Division of the Western District of Missouri to be declared a bankrupt and in due course was declared one. A trustee was appointed. His report shows that all the personal property listed was allowed to the bankrupt as exempt. We infer that all the real estate disclosed

by the schedule attached to his bankruptcy petition was also set off to him as exempt. At any rate his creditors got nothing whatever. His petition in bankruptcy alleged that Schedule A attached thereto contained a statement of all his debts together with the names, residences and postoffice addresses of his creditors. This schedule is r t set forth in the record. We know not whether he listed as debts the notes he gave to Hayden and which remained unpaid through the foreclosure.

His said petition also contains the following allegation: "That the schedule hereto annexed, marked Exhibit B, and verified by your petitioner's oath, contains an inventory of all of his property, both real and personal, and such further statements concerning said property as he is able to give and as required by the said acts of Congress." Attached to that schedule was Scott's affidavit to the effect that being duly sworn he did declare said schedule to be a statement of all his estate, both real and personal, in accordance with the acts of Congress relating to bankruptcy. A creditors' meeting was called in due course by the referee, Mr. Spencer. In the course of that meeting the conscience of Mr. Scott was sifted thoroughly and he disclaimed any knowledge of any other property except that scheduled by him in schedule B. Schedule B covered household, kitchen and office furniture, one cow, one horse and buggy, one dwelling-house in Joplin (mortgaged and the equity claimed as exempt), one-half interest in a mining lease near Smelter Hill and one-half interest in a mining lease on Granby land. There was no mention in the schedule of any interest in the land in suit, and during that proceeding, as it ran its course in the bankrupt court, Scott called no attention to any such claim.

At the creditors' meeting claims were allowed against the estate of the bankrupt. Mr. Scott was there with his attorney, and Mr. Howard with his.

Thereupon Howard filed two claims—first, his judgment in "suit A" with accrued interest which was allowed; second, the notes acquired by him from Hayden —all then due. He allowed credit for O'Donnell's bid at the foreclosure, computed the interest to date and asked an allowance for one-half the total sum— his theory being that by the purchase of a half interest in the farm subject to the mortgage for the deferred payments he and Scott owed that debt half and half. The first note due showed on its back the foreclosure data and the credit of the bid. Scott knew this claim was filed for allowance against his estate as a debt due from him to Howard. He knew it was up for consideration and yet he remained silent though present with his attorney. There is a bit of evidence (from Scott and his attorney) that Scott turned to his own attorney and with some excitement of manner questioned the justice of that allowance, but what he said was between those two. Neither the referee nor Howard nor his attorney heard any protest from him against such allowance. Scott's attorney took Scott's remarks as addressed to his ear alone; for he told Scott "to make no fuss," "to let it go," and directed that remark to Scott's ear. The upshot of it was that Scott's attorney remained mute. Scott acquiesced in such "possum policy." The Hayden notes were allowed for $1880.40 and no attempt was made to have the allowance reconsidered or expunged. On December 31, 1903, the trustee filed his final report showing that he had neither received nor paid out any money on account of the estate. On January 7, 1904, Mr. Scott filed his petition under oath for his discharge in bankruptcy. Under that oath he stated he had duly surrendered all his property and rights of property and had fully complied with the Bankrupt Act. On February 10, 1904, an order was handed down by the Federal judge discharging him as a bankrupt. These bankrupt proceedings will be called "suit B."

It will be observed that Scott having opened nego-
tiations with Smith relating to his interest in the land
sometime in January, 1904, those negotiations ripened
into the contract of date of the 29th of that month,
as said. On that same day Scott sued Howard in the
State court to set aside the trustee's deed to O'Donnell
and O'Donnell's deed following, and to revest into him,
Scott, a one-half interest free of the lien of the deed
of trust. This on the theory of the payment of the
secured notes prior to the foreclosure. At that time
the bankrupt proceedings were still pending in the
Federal court and undisposed of, final adjudication
being twelve days afterward. The attention of the
referee, nor of the trustee, nor of the creditors filing
claims in the bankruptcy proceeding, nor of the Fed-
eral court was called to said suit of January 29th.

The suit we have now reached will be called "suit
C" and it will be necessary to develop the theory of
that case with some particularity. Howard, in the
meantime, had left Jasper county and returned to
Illinois. Service was had on him in "suit C" by an
order of publication, the affidavit of non-residence
made by Smith as agent for Scott. The allegations
in the petition were, in substance, that Scott owned
the land and executed the Hayden deed of trust secur-
ing three notes; that thereafter Scott conveyed to
Howard an undivided interest in it subject to the
deed of trust; that as part of the consideration of
the conveyance from Scott to Howard the latter agreed
to pay one-half of the indebtedness; that defendant
paid the first note and it was surrendered and can-
celled, leaving the last two notes, one due on January
22, 1900, and the other one year later; that thereafter
plaintiff paid to defendant the half of all three notes
with the interest thereon, being his whole share there-
of, and defendant received such payment and agreed
to pay said notes and have them and the deed of trust
satisfied in full; that defendant did not cancel the notes

and deed of trust as agreed, but shortly after receiving payment from plaintiff fraudulently and unknown to Scott caused plaintiff's one-half interest in the property to be sold on the 8th day of October, 1900, and fraudulently used one O'Donnell to bid in the property at an inadequate bid of $500, and thereafter fraudulently caused O'Donnell to deed the land to defendant, intending by each and all said things to cheat and defraud plaintiff and to acquire his interest in the land; that said fraudulent deeds caused a cloud on the title of plaintiff's interest in the land, and the court is asked to decree said conveyances null and void and to decree an undivided half interest in fee into plaintiff free and clear of the lien of said trust deed, and that the trust deed and notes be cancelled and that partition be made of the premises between plaintiff and defendant.

The suit was instituted in the Jasper Circuit Court at Joplin. The order of publication was made in the "Oronogo Index," a newspaper published in a little town some distance away and defendant Howard was ordered to appear at ensuing April term. Said order of publication, among other things, stated that the "Oronogo Index" was "designated by the plaintiff as most likely to give notice to said defendant." Howard had no actual notice of this suit. At said April term a decree was entered following the lines of the petition—finding the allegations therein true, *seriatim,* and decreeing the foreclosure by the trustee void for fraud and the conveyance subsequent void for fraud, declaring Scott the owner of an undivided one-half interest "free from all encumbrance of said deed of trust" and that plaintiff was entitled to partition. From this on, things moved off with a quick step. Commissioners were appointed at the time of the judgment, viz., May 14, 1904, to make partition. Two days later they qualified. On the same day they made their report partitioning the land equally between the two,

and filed the same in court. Four days later the report was approved. It seems that Mr. Smith employed Mooneyham and Gregory to bring and prosecute the case under his, Smith's, contract with Scott. That is, the arrangement was made with Mooneyham, at the time a partner with Gregory. These attorneys were allowed a fee of $200 to be taxed as costs. On the day the report of the commissioners was filed and signed Scott and wife (with Smith's consent) deeded to Mooneyham, "in consideration of the sum of one dollar and other good and valuable considerations," that part set off to Scott. This deed was acknowledged on May 17, 1904, but not recorded until the 13th day of June, 1904. Its record at once attracted the attention of Howard's attorneys, Thomas and Hackney. Howard was notified and a fortnight after commenced the suit at bar.

We shall omit the voluminous pleadings, attending to the gist of them, because of a certain contention made on appeal on the nature of the suit. The petition is plainly a bill in equity. It narrates the history of the purchase of the 137 acres by Scott from Hayden, the execution of the deed of trust for the deferred payments, the execution of a warranty deed from Scott and wife to Howard for·one-half interest subject to one-half of the said deed of trust debt, and alleges that plaintiff assumed and agreed to pay said one-half; that subsequently Scott and wife defaulted in the payment of their one-half; that thereupon Howard bought the notes from Hayden, Manker the trustee refused to serve, and the sheriff of Jasper county at Howard's request advertised and sold at public outcry the half interest of Scott at the court-house door in Carthage to O'Donnell, the highest and best bidder, the execution of the trustee's· deed to O'Donnell and O'Donnell's to plaintiff. That the premises considered, the plaintiff became the owner of the real estate. The bill goes on to allege the facts relat-

ing to "suit C" wherein Scott sued Howard and whereby the sale and the deeds pursuant thereto were set aside, partition made between Howard and Scott and Mooneyham turned up as the claimant of Scott's share. Each step in that suit from start to finish is alleged to have been a fraud upon the court and Howard. The allegations of the petition therein to the effect that Scott had paid his full share of the indebtedness to Howard and the latter had agreed to release the deed of trust and cancel the notes, etc., are alleged to be false; and the testimony submitted to the court and upon which those allegations were sustained is alleged to be perjured and false; the commissioners' report in partition and the confirmation thereof are charged to be the mere incidents of a fraudulent scheme subversive of justice; that plaintiff had no notice of any of those proceedings or the pendency of that suit and did not know that Scott was making any claim to the land. The proceedings in bankruptcy, "suit B," are next narrated in the petition and it is charged that Scott was adjudged a bankrupt; that in that case he laid no claim to any interest to the land, and that Howard with Scott's knowledge and in his presence made proof of his claim founded on the difference between Scott's half of the Hayden notes and the proceeds of the foreclosure sale and the same was allowed, etc. It is next alleged that the deed from Scott to Mooneyham was fraudulent and made for the purpose of cheating and defrauding Howard; that Mooneyham was the attorney of Scott in "suit C" and had notice and knowledge of its fraudulent character. In a nutshell, to sum up, the petition was broad enough to pass under judicial scrutiny all the tangle of facts hereinbefore set forth.

The relief sought was a decree vacating and annulling the partition proceedings from end to end and vacating the deed from Scott to Mooneyham; the vest-

ing out of them and each of them and into Howard
the title conveyed by the Mooneyham deed to the
lands set apart by the commissioners to Scott. The
defendants were duly summoned and filed separate an-
swers. Scott answered by admitting the allegations
of the petition relating to title of the land up to the
point that Howard acquired a half interest subject
to half of the deed of trust, which half Howard as-
sumed and agreed to pay. He denies that he defaulted-
in the payment of his half and avers and reiterates
the allegation in his petition in "suit C" to the ef-
fect that he.paid to Howard, and Howard received
Scott's half, of the whole mortgage debt before fore-
closure and in turn agreed to pay the whole of it to
Hayden and satisfy the deed of trust. He next avers
that Howard paid the whole debt to Hayden, but failed
and neglected to release the deed of trust. The trustee's
sale and the deed made to O'Donnell and by him to
Howard are next assailed as fraudulent precisely as in
the partition proceeding, "suit C." The answer goes on
at length to plead all the allegations of the partition
petition and the steps in that suit as a defense in this
case. It next takes up .the bankruptcy proceedings
and admits that Scott did not list the real estate in
question as an asset, gives as his excuse therefor that
he then thought his title had been fully and com-
pletely vested out of him by reason of the sale under
the deed of trust-and that his concealment of his inter-
est and title was through mistake and not through
fraud. It next pleads a final discharge in bankruptcy
and asserts the good faith of the partition proceedings,
admits executing a warranty deed to Mooneyham, de-
nies. its fraud, asserts it was made in good faith and
for a valuable consideration.

The answer of Mooneyham is to the same effect.

The reply ran in the form of a general denial to
the separate answers.

At the trial the testimony took a wide range. The

issues and pleadings in "suits A, B, and C," were either directly or indirectly involved in the present case and appear in the record. Many of the facts established and developed at the trial in this case we have set forth in this statement. We now refer to them and shall not swell the opinion by repeating them.

It is proper to say that not only in the bankruptcy proceedings was the fact concealed that Scott claimed an equitable interest in the land in dispute, but in "suit C" the State court was not informed that Scott had gone into bankruptcy or that he had not been discharged at the date he claimed the land, began the proceedings to recover it by setting aside the foreclosure, and to have partition free of the encumbrance of the Hayden deed of trust.

The decree annulled the partition judgment (in part), the report of the commissioners, and the confirmation of that report, as fraudulent. It also set aside the deed from Scott to Mooneyham as void. There was an important exception mentioned presently. It found and adjudged that Scott had never paid his share of the Hayden notes to Howard or in anywise discharged them.

So much for that part of the decree favorable to Howard.

The chancellor then went on to decree that one half of the Hayden notes is a valid debt "and a lien against Adam Scott's interest in said land under the terms of said deed of trust in favor of the plaintiff in this case," and it adjudged that that part of the decree in the partition suit which found the foreclosure proceeding, the trustee's deed to O'Donnell, and O'Donnell's deed to Howard were fraudulent and void and of no effect, "be and the same is hereby approved and confirmed as valid." Costs were taxed against defendants.

From that decree both parties appeal, as said,

and by agreement here the appeals were consolidated to be heard and determined as one cause.

I.  On one phase of the case, plaintiff's counsel argue after this fashion:  the entire interlocutory and final judgment assailed should have been vacated *as of course,* they say; and so much of the decree as left part of the judgment effective in Scott's favor (viz., that part setting aside the trustee's sale and putting the title to the land in Scott and Howard subject to the deed of trust) is erroneous.  This branch of their argument rides off on the theory that the suit is, in effect, a statutory review of the partition judgment. When brought to book on that proposition is it so? We think not, because:

By Revised Statutes 1899, sections 777 to 784 inclusive, a statutory scheme is provided for reviewing a final judgment on default if the defendant be not summoned and has not appeared and the proceeding for review be commenced within three years, or, in a named contingency, in one.  By such petition for review an easy and beaten path is marked out, if an injured defendant choose to take it with the conditions imposed.  He need only show "good cause for setting aside such judgment," for instance, that plaintiff's petition on which the judgment was obtained "is untrue in some material matter, setting it forth, or that he has and then had a good defense thereto, setting such defense forth, or both."  He need not plead or show fraud as a ground for vacating the judgment. [Irvine v. Leyh, 102 Mo. 200; R. S. 1899, secs. 777 to 780, supra.]  We are not saying he may not plead fraud.  We say he need not handicap himself with the burden of the plea unless he so elects.  If the statutes be complied with by the petitioner, the judgment may be vacated, but only on a condition, viz., that defendant answer or demur to the petition on which the judgment was rendered within a reasonable time

to be ordered by the court. If such answer or demurrer come in, then the original cause proceeds in due course for hearing as if there had been no prior adjudication. If the answer or demurrer do not come in in accordance with the leave, then the original judgment is made absolute. If, meanwhile, property has passed under the judgment to innocent purchasers, they are to suffer no prejudice by setting it aside (section 784).

Here Mooneyham has acquired the share set off to Scott, and Mr. Howard, as plaintiff (not as a defendant), brings Mooneyham in as a party defendant and seeks relief against him. The petition was neither entitled nor filed in the original suit. It did not proceed on strict statutory grounds; for the gravamen of the complaint is fraud, and fraud is the most ancient foundation of equity jurisdiction. Observe, Howard tendered no answer or demurrer in the original suit; he did not ask to go on in that case and to have the judgment opened that he might go on. *Contra,* the relief sought was to sweep away the judgment, the report of the commissioners and its approval, together with Mooneyham's deed, as the product of fraud and (more significant still) to re-establish his own title out of hand and once for all. It was then a suit to cut behind the partition judgment and proceedings and to try out the merits, not to reopen the old case and proceed to another judgment on another trial in that case. Not only so, but that object was attained by the decree. Therefore, we hold that, having sued in equity, made Mooneyham a party with Scott, and having taken a decree setting aside Mooneyham's deed and the main terms of the partition judgment for fraud, thus avoiding the plain beaten path of the statutes and its incidents, plaintiff's present contention is unsound. The scope of the pleadings, the parties, the relief sought and obtained and the whole course of the trial considered, it becomes clear

this was not a statutory review with statutory limitations, but an original case in equity, pure and simple. Having elected to go into chancery, plaintiff must abide his choice, stay there and take the bitter with the sweet. He cannot appeal to the statute and to statutory relief with one breath and with the next to equity, but get relief by the application of equity principles or none at all. Learned counsel rely on Bagley v. Sligo Furnace Co., 120 Mo. 248. But that case does not run *quatuor pedibus* with this. It was a review of a tax judgment. The State as original plaintiff could not be served, hence the purchaser was notified. Besides, the point now up was not made.

The point is ruled against plaintiff.

II. Defendants' counsel argue, in substance, that the petition does not earmark the fraud or specify the facts constituting it. They say that to charge fraud generally is to charge a mere legal conclusion; that the substantive and ultimate facts constituting the fraud must be stated or there is no issuable allegation; furthermore, that the strict rules applied in cases where the solemn judgment of a court or the validity of a deed is assailed, require a corresponding strictness and fullness of precision in charging fraud as a ground of relief—all of which propositions may be allowed to them—and finally, that plaintiff's bill states no cause of action and hence so much of the decree as is in favor of Howard must fall. We shall not further develop this contention, nor reproduce the bill here in determining the point. We think the petition good after judgment —at least in the absence of a timely motion to make more specific and definite, or other timely objection *nisi*. It is not without particularity in charging facts constituting the alleged fraud. Learned counsel did not assail it below as bad for that it stated no cause of action. There can be no appreciable unfairness in our entertaining here the view they entertained below and upon

which they took their chances of a trial on the merits.
First impressions are often best, as the adage puts it.

The point is ruled against defendants.

III.   Defendants' counsel assign error in that,
on the facts, there was no such fraud in the very concoction and procurement of the judgment in the partition suit as furnishes grounds to annul it in equity.
We are cited to a line of cases in that behalf, of which
Wabash R. R. Co. v. Mirrielees, 182 Mo. 126, is a fair
and fresh example.

In determining the question raised it is not amiss
to remind ourselves of some fundamental propositions
vital to justice.   It is axiomatic that fraud is odious.
It vitiates everything.   It is the delight and glory of
a chancellor to feel for it and snatch away its fruits
with a strong hand when found.   Judgments of courts
are not immune from it.   To the contrary, more's the
pity, many a heinous fraud wears the form and semblance, the fair and honest face of an orderly procedure in courts of justice, and takes its consummation
and works its iniquity under the forms of law—the
imitation of solemn honesty is but a tribute vice pays
to virtue.   Accordingly, when fraud is charged, the
piercing and discriminating eye of the chancellor looks
for it high and low, whether it hide out in some everyday affair or in the judgment of a court.   So, equity
seeks substance, not form, in pursuit of fraud.

What is fraud?   No statute and no judge has been
so daring and unwise as to define it by hard-and-fast
rules.   That pre-eminent jurist who "perfected English equity into a symmetrical science," who is deemed
by no less an authority than Lord Campbell "the most
consummate judge who ever sat in the court of chancery," Lord Chancellor HARDWICKE, he who, as the
lad Philip Yorke, was designed by his pious Presbyterian mother for some *"honester trade"* than the profession of an attorney (she longing to "see his head
wag in the pulpit") who gave his "days and nights

to the volumes of Addison'' in acquiring a luminous and chaste style and, at the bar, with unremitting toil and pains superadded to a happy temperament and facile and receptive mind, informed and grounded himself in all essentials to wisdom, learning and virtue on the woolsack, so that his administration on that judgment-seat is ''fondly looked back upon as the golden age of equity,'' laid down the precept, never since departed from, that fraud should be left undefined. In Lawley v. Hooper, 3 Atk. 278, referring to a species of fraud, he said: ''The court very wisely hath never laid down any general rule beyond which it will not go, lest other means of avoiding the equity of the court should be found out. Therefore they always determine upon the particular circumstance of each case. . . .'' Elaborating that idea in a letter to Lord Kaimes, quoted by Story (1 Story Eq. [13 Ed.], p. 200), he says: ''As to relief against frauds, no invariable rules can be established. Fraud is infinite; and were a court of equity once to lay down rules how far they would go, and no farther, in extending their relief against it or to define strictly the species or evidence of it, the jurisdiction would be cramped and perpetually eluded by new schemes, which the fertility of man's invention would contrive.'' That proposition, *totidem verbis,* has met the approval of this court. [Clyce v. Anderson, 49 Mo. l. c. 40.] In that same case the text of Story is approved, viz., that fraud ''in the sense of a court of equity, properly includes all acts, omissions, and concealments which involve a breach of legal or equitable duty, trust, or confidence, justly reposed, and are injurious to another, or by which an undue and unconscientious advantage is taken of another.'' [1 Story's Eq. (13 Ed.), sec. 187.]

Broadly speaking, it may be said that false evidence or a lying allegation in a petition is not sufficient to overturn a judgment after the term by a direct proceeding in equity; the idea being that there should be

an end to a lawsuit, that every man should have his day in court—not two days,—that for the general welfare of society litigants might better be held to take their chances of false swearing on the stand and false allegations in pleadings rather than to allow the reagitation of matters once passed into the category of things adjudicated; for if equity on such ground vacate a judgment by a new one, why not overturn the latter by a new suit and so on without end.  So that it is frequently laid down that fraud which will overturn a judgment must arise on extrinsic and collateral matters and not on the very issues presented by the pleadings and passed upon at the trial.

For my own part, I lean strongly to the notion that the strictness of the doctrine just announced should be applied only to those cases where there is service of process, or actual notice of the suit, or where an appearance is entered and the complaining party has had a chance to meet his adversary and join issue; and that the doctrine ought not to be applied strictly or mechanically to judgments on mere newspaper notice where the defendants knew nothing of the pendency of the suit.  If the rules of law are to be administered with reason and never run beyond the underlying reason of them such would seem to be the better view; but in Irvine v. Leyh, 102 Mo. l. c. 207, that view of it was put baldly and strongly to this court by BLACK, J.  It met the concurrence of GANTT, J., but the majority of his brethren refused to adopt it.  Nine years afterwards in Wonderly v. Lafayette County, 150 Mo. l. c. 650, the *dictum* of BLACK, J., was referred to by VALLIANT, J., as announcing the "reason" of the law and no exception was taken by any of his brethren.  If the proposition announced by Judge BLACK has been ruled by this court since the Irvine case it has escaped me. However, no such discrimination between judgments on actual as against those on newspaper service has been announced in the many cases decided here assail-

ing judgments for fraud. But the doctrine has been uniformly laid down broadly as announced in Wabash R. R. Co. v. Mirrielees, supra, and the cases there collated and cited to the effect that false swearing and false averments in pleadings do not give rise to an action in equity to set aside a judgment for fraud. Such, then, may be taken as accepted doctrine. There must be some fraud committed on the court itself in the procurement of the judgment, arising extrinsically or collaterally to the issue tried, or on the party himself arising in the same way.

Nevertheless no court has undertaken to point out and define the particular frauds which will vitiate a judgment any more than it has to define fraud generally, and many cases attest the acute diligence of courts in classifying facts as *extrinsic* and *collateral* in order to save the administration of justice from the heavy reproach of enforcing an unconscionable advantage sounding in fraud in procuring a judgment. In Wonderly v. Lafayette County, supra, the scheme denounced there was said to be a "fraud on the court whose jurisdiction was betrayed and a fraud on defendant who was tricked out of his defense." That case illustrates the honorable sensitiveness of courts to frauds on their jurisdiction, and shows how shadowy, uncertain and somewhat arbitrary is the line between fraud in the procuring of the judgment as distinguished from fraud in the cause of action itself. In other cases judgments have been annulled because of tricks and deceptions whereby the court has been made an "instrument of injustice." [Bresnehan v. Price, 57 Mo. 422; Lee v. Harmon, 84 Mo. App. 157; Clyce v. Anderson, supra; Fitzpatrick v. Stevens, 114 Mo. App. 497.]

In the case at bar the jurisdiction of the Federal court on the subject-matter of this controversy was betrayed if the theory be adopted that Scott had any interest left in the land of any value; for he concealed

it from that court industriously, accentuating his concealment by piling oath upon oath, the last in order to get his discharge and withdraw the subject-matter (and himself) out of the jurisdiction of that court. Not only so, but under section 7 of the Bankrupt Act it was his duty to examine the correctness of all proofs of claims filed against his estate, to disclose to the trustee his knowledge as to any person having proved a false claim against his estate. In violation of that duty he allowed Howard to get an allowance for one-half of the unpaid balance of the Hayden notes, when, on his theory of it, he had already paid those notes in full to Howard. Under the Bankrupt Act the referee court (for by that act the word "court" may include the referee, section 1) has power to set aside an allowance when wrongfully made, and by concealing his pretended knowledge of the payment of that claim he betrayed the jurisdiction of the court in that regard. Not only so, but by the Bankrupt Act the trustee of a bankrupt estate acquires title to all property which the bankrupt might have by any means transferred or which might have been levied upon and sold by judicial process against him (section 70). Now, if Howard held title to Scott's half interest subject to redemption by paying his *pro rata* share of the Hayden indebtedness, or if Scott had an equitable interest in that land of any kind, it was subject to execution (R. S. 1899, sec. 3171) and therefore passed to the trustee. The title was in the trustee by operation of law and Scott perpetrated a fraud upon the jurisdiction of the State court in bringing the suit in his own name while the bankruptcy proceedings were pending, upon the Federal court in concealing from it its jurisdiction, and upon both courts by concealing the jurisdiction of the other. Not only so, but, on Scott's present theory, his creditors were tricked in the bankrupt court. First, by permitting Howard without protest to have a bogus claim allowed, thereby acquiring a

right to share in the corpus of the bankrupt estate, if any; and, second, by decreasing the corpus of the same estate in his concealment of his interest in the land. Not only so, but Howard himself was tricked. The attitude of Scott at that time by his concealment of his claim resulted in Howard having one-half of the notes allowed as an *unsecured* claim on the theory the security was exhausted by a valid sale. It lulled him to sleep on the question of his title. He had no call to look out for a suit, on the same subject-matter, by Scott thenceforward. If the validity of the foreclosure was ever to be questioned that was the time that justice required a disclosure of the facts so that all Scott's property should be administered upon for his creditors. Viewed from any standpoint the conduct of Scott amounted to an acquiescence in the foreclosure, was tantamount to a solemn admission in the referee's court that his one-half of the Hayden notes, deducting the foreclosure bid, was a valid indebtedness, unsecured on real estate. Otherwise, as a secured debt, Howard would not have been entitled to any dividends out of the general estate. That no meal was ground out of the hopper of justice in the form of dividends amounts to nothing in determining the legal status of things thus brought about. What was being done was not mere mummery. It looked forward to dividends and prepared for them. When we look to the origin of this case in Smith's contract with Scott and consider the concealments from the Federal and the State courts, we are not prepared to say that the jurisdiction of both courts was not betrayed in matters extrinsic and collateral to the issues in Scott's suit against Howard and that Howard was not tricked "extrinsically" too. Certain it is that by acquiescing in Howard's allowance of his claim as unsecured and by getting acquit of the allowance by a discharge in bankruptcy, he either did (or tried to) trick Howard out of his right to claim the deed of trust that secured Scott's

half of the entire original debt, or put that right in
jeopardy in any subsequent litigation over the land.
It would seem that such conduct constituted an elec-
tion to abide the foreclosure sale and to consider the
deficit a valid debt.

That fraud was also perpetrated by false aver-
ments in Scott's petition and by false testimony at
the trial might not by itself be sufficient to overturn
the judgment, but certainly proof of the latter frauds,
abounding in the case, ought not to help sustain the
judgment or prevent its overthrow if other fraud in
extrinsic and collateral matters challenged the atten-
tion of the chancellor. Such frauds were abundantly
proved.

The point is ruled against defendants.

IV. For Howard it is argued that the decree was
erroneous in so far as it reinstated the lien of the deed
of trust and made Scott's half of the debt a valid lien
on his one-half interest in the real estate, and in so far
as it approved and confirmed as valid that part of the
judgment in "suit C" which set aside the foreclosure
proceeding, the trustee's deed to O'Donnell and the
deed from O'Donnell to plaintiff. Attending to that
contention we think it sound. The pleadings were not
framed on the theory the deed of trust should be re-es-
tablished. The plaintiff did not ask that, nor did the
defendants. Defendants did not ask to redeem or show
a disposition to redeem. Their theory was that the
notes were paid and that the foreclosure was fraudu-
lent because they were paid. Plaintiff's theory was
that the notes were not paid and that the foreclosure
was made because of default in payment—furthermore
that the judgment in "suit C" was fraudulent. The
defendants' theory was *contra*. In this condition of
pleadings and issues Scott was put in the way to re-
deem without asking for redemption.

Not only so, but he was put in a situation to re-
deem when, at the time of bringing the suit, the title

to his interest was in the trustee in bankruptcy and he had no right of action whatever at that immediate time. That a decree must be within and not broader than the pleadings is elementary. [Roden v. Helm, 192 Mo. 71; Kilpatrick v. Wiley, 197 Mo. l. c. 162.]

If Scott had had the right to sue and the case had been tried on the theory of the right to redeem and the pleadings had been construed by the parties that way, a different case might be here.

So, if the case had not been brought during the pendency of the bankrupt proceedings and if the Federal court, on its attention being called to the existence of property not scheduled and distributed, had refused to set aside its order winding up the estate and discharging the bankrupt, and if Scott had sued after that in the State court, we might have had a different case. After the judgment in bankruptcy and while that cause was pending, Scott became *civiliter mortuus* as to his property not exempt, and the title thereto; but, when once discharged, he was no longer civilly dead and the title might be restored to him if the Federal court did not again reach out its hand and seize it. [Scruby v. Norman, 91 Mo. App. 517.]

Again, if Scott had not been civilly dead as to this land when the suit was brought and if he had brought a suit to set aside the foreclosure on the ground of some irregularity connected with the sale or because the advertisement of the sale was made in such a manner as to *prevent* instead of *give* notice and was a trick upon him whereby he had lost a valuable estate at a sham sale for an inadequate consideration, there might have been a different case here.

So, if under similar circumstances, he had sued to set aside a sham sale and to redeem on the theory that the Hayden debt was a common burden on the common title, that his cotenant was a purchaser at the sale and, because of the relation of trust and confidence imposed by cotenancy, such purchase inured to

his benefit and he was entitled to redeem by paying a price for his decree, to-wit, by submitting to equitable terms and paying his debt, we might have had a different case here. [Hinters v. Hinters, 114 Mo. 26; Cockrill v. Hutchinson, 135 Mo. 67; Rutter v. Carothers, 223 Mo. 631.]

Plaintiff's assignment of error is well made. We so rule.

V. There is one other question. Mr. Mooneyham's insistence is that the decree is erroneous in setting aside his deed. It is argued he was an innocent purchaser under the partition judgment. The testimony shows Smith was the prime actor. In the significant language of his contract he agreed *"to do and perform all things necessary"* to recover the land.

Mr. Mooneyham came in under Mr. Smith. He drafted that contract. He never came in contact with Scott until about two days before the trial in "suit C." He knew of the bankrupt proceedings. As agent for Smith and Scott, as an alert and capable attorney, he is presumed to have performed his duty in advising himself in relation to the pendency of that proceeding and that the title to Scott's land was in the trustee. At some time not clearly disclosed he took upon himself a dual relation, namely, as an attorney and as a purchaser from Scott. He bought untimely, before final judgment approving the commissioners' report. This with Smith's acquiescence. He holds now as trustee for Smith because he had not settled with him and the contract provided that Smith, not Mooneyham, should have a half interest. Scott's hurried deed to Mooneyham narrates a consideration of one dollar and other considerations not named. It seems that Scott had some mining claims he was exploiting, that Mooneyham advanced money on those claims either to develop them or to buy them, that when Howard brought his present suit Mooneyham

still owed Scott on the land transaction and on the mining dicker, and that after the suit he paid him money, viz., the bulk of all due for the deed. Some of the purchase money, together with Smith's claim, still remains in "abeyance." The circuit court found Mr. Mooneyham was guilty of no actual fraud. We have no disposition to question the correctness of that finding. But the facts are of such a sort that Mooneyham was put on inquiry. He must be charged with all the information such inquiry, diligently pursued, would give. There is nothing to show that Scott or Smith would have held information back from their counsel, or that the information was hard to get. Under the circumstances of this case, Mr. Mooneyham must be held to hold not as an innocent purchaser for value, but subject to Howard's rights. The decree ought not to be disturbed because of any error in setting aside his deed.

The premises considered, the decree is affirmed as to the appeal of appellants, Scott and Mooneyham. That part of the decree appealed from by the appellant Howard is reversed and the cause is remanded with directions to the lower court to enter a decree giving Howard the full relief prayed in his petition. All concur, *Valliant* and *Woodson, JJ.,* in the result.