**In the Matter of the ESTATE of Walter BARCIKOWSKI, Deceased.**

**Josephine BARCIKOWSKI, Respondent,**

v.

**Stanley BARCIKOWSKI, Appellant.**

**No. 55599.**

Supreme Court of Missouri, Division No. 2.

May 8, 1972.

Motion for Rehearing or to Transfer to Court En Banc Denied June 12, 1972.

Ann Q. Niederlander, Margaret M. Nolan, Clayton, for (movant) respondent.

Dulin, Kings, Parres & McDowell, St. Louis, for administratrix c. t. a.

Schurr & Inman, Clayton, Cletus E. Rudolph, St. Louis, for respondent-appellant.

DONNELLY, Judge.

This is an action originating in the probate court of the City of St. Louis to discover assets in the estate of Walter Barcikowski, deceased. (V.A.M.S. §§ 473.-340 and 472.030; In re Myers' Estate, Mo. Sup., 376 S.W.2d 219.) The petitioner was Josephine Barcikowski, the surviving spouse, and the respondent was Stanley J. Barcikowski, son of the deceased. The subject matter of the action was $37,317.76 held in various bank and savings and loan accounts in the names of Walter Barcikowski and Stanley J. Barcikowski. On appeal to the circuit court, a hearing was had, and Stanley J. Barcikowski was ordered to pay said sum, with interest, to the estate. This appeal followed.

We must determine the legal effect of V.A.M.S. §§ 362.470 and 369.150, which read as follows:

"§ 362.470.  Joint deposits

"When a deposit is made by any person in the name of the depositor and any one or more other persons, whether minor or adult, and in form to be paid to any one or more of them, or the survivor or survivors of them, the deposit thereupon and any additions thereto made by any of these persons, upon the making thereof, shall become the property of these persons as joint tenants, and the same, together with all interest thereon, shall be held for the exclusive use of the persons so named, and may be paid to any of

them, or to the survivor or survivors of them; and the payment and the receipt or acquittance of the one to whom the payment is made shall be a valid and sufficient release and discharge to the bank or trust company, whether any one or more of the persons named is dead or alive, for all payments made on account of such deposit prior to the receipt by the bank or trust company of notice in writing signed by any one of the joint tenants not to pay the deposit in accordance with the terms thereof. If more than two persons are named as such depositors and one of them dies, the deposit becomes the property of the survivors as joint tenants."

" § 369.150. Joint accounts

"1. An association may issue membership certificates in the name of two or more persons, whether minor or adult, and in form to be paid to any one or more of them, or the survivor or survivors of them.

"2. Such account, and any additions made thereto by any of them, shall become the property of such persons as joint tenants and shall be held for the exclusive use of the persons so named and may be paid to any person named therein, or the survivor or survivors of them.

"3. And such payment and the receipt or acquittance of the one to whom such payment is made shall be a valid and sufficient release and discharge to said association, whether any one or more of the persons named be living or dead, for all payments so made by the association on such account prior to the acknowledgment of receipt by, or service by an officer empowered to make service of process upon, said association at its home office of notice in writing signed by any one of such joint tenants not to pay such account in accordance with the terms thereof.

"4. If there are more than two persons named in such membership certificate and one of such persons dies, the account represented by such certificate shall become the property of the survivors as joint tenants. Such a joint account shall create a single membership in an association."

This Court has held that each of the above statutes " * * * gives rise to a presumption that a deposit made within its purview becomes the property of the depositors as joint tenants, and, in the absence of competent evidence to the contrary, actually fixes the ownership of the fund in the persons named as joint tenants with the attendant right of survivorship. * * " Murphy v. Wolfe, 329 Mo. 545, 552, 45 S.W.2d 1079, 1081 (1932); In re Patterson's Estate, Mo.Sup., 348 S.W.2d 6.

In the case of In re Kaimann's Estate, 360 Mo. 544, 550, 551, 229 S.W.2d 527, 530 (April 10, 1950), a father and son opened a joint account with money belonging to the father, the father died, and an action to discover assets was brought in the probate court. This Court held that testimony that the son " 'made his [father's] income tax returns, kept his books and generally took care of his affairs' " was evidence of a confidential relationship between the father and son, and affirmed the order of the trial court that the son pay the amount of the joint deposits into the estate.

In the case of Commerce Trust Co. v. Watts, 360 Mo. 971, 979, 980, 231 S.W.2d 817, 821, 822 (1950), Amos B. Crandall and his deceased wife's nurse, Hattie Watts, opened a joint account with money belonging to Amos B. Crandall, Crandall died, and a bill of interpleader was brought asking the court to determine which of the parties was entitled to the funds in the joint account. The court referred to the Kaimann case, supra, as one which "presented facts and issues not before us here which clearly distinguish it from the instant case," held that "neither parol evidence nor extrinsic circumstance was admissible to contradict or vary the intention of the parties expressed in their solemn contract," and ordered payment to Hattie Watts.

In the case of In re Patterson's Estate, supra, Mo.Sup., 348 S.W.2d 6, 9 (1961), R. Hadley Patterson and his cousin, Mrs. Willie Lee Golding, opened joint accounts with money belonging to Patterson, Patterson died, and a suit was brought to determine the ownership of the accounts. The circuit court, considering itself bound by the holding in *Commerce Trust,* supra, held in favor of Mrs. Golding. This Court was of the opinion that the case should "be determined in accord with the principles and rules announced in the Kaimann case," and reversed and remanded for trial.

The net effect of the holdings in the above cases is that the presumption recognized in Murphy v. Wolfe, supra, does not come into being in a situation where a confidential relationship between the alleged donor and alleged donee exists; and, if such confidential relationship exists, the burden is on the alleged donee "to establish the validity of the gift." In re Patterson's Estate, Mo.Sup., 383 S.W.2d 735, 739 (1964).

There is no evidence in the case which would support a finding of a gift, absent the Murphy v. Wolfe presumption. The question then becomes whether a confidential relationship existed between Walter Barcikowski and Stanley J. Barcikowski.

In Wilhoit v. Fite, Mo.Sup., 341 S.W.2d 806, 813, this Court approved the following statement from Selle v. Wrigley, 233 Mo. App. 43, 116 S.W.2d 217, 221:

> "It may therefore be said that a confidential relation exists between two persons, whether their relations be such as are technically fiduciary or merely informal, whenever one trusts in and relies on the other. The question in such case is always whether or not trust is reposed."

Josephine Barcikowski testified in part as follows:

"Q Mrs. Barcikowski, after your husband got rid of his car, after this accident, who drove him around to take care of his business? A Well, I think his son Stanley.

"Q Who cashed your husband's Social Security check?

"A Stanley.

"Q Who paid the gas and electric bills? A Stanley.

"Q Now, Mrs. Barcikowski, after Walter became ill who gave you the money for the groceries? A Stanley.

"Q Who really went to the store? A They stop for me because I couldn't leave my husband alone.

"Q Because he was very ill, correct? A Yes, he was.

*   *   *   *   *   *

"Q Mrs. Barcikowski, after your husband's funeral, after Walter's funeral, did anyone take anything out of the house?

"A Yes. Next day Stanley came and went to basement and took two boxes and case of beer.

"Q Now do you know what was in those? A No, I don't know.

"Q Those two small wooden boxes? A No, I don't know.

"Q Had you seen them before? A No. I didn't look nothing in the basement; I didn't know. And my husband didn't show me anything.

"Q Do you know of your own knowledge whether or not Walter had a safe deposit box? A I know he told me he had by Stanley, because I left first time I left my ring; and I come back so he went and got the ring from Stanley's safe box.

"Q In other words your wedding ring? A My wedding ring, yes.

"Q When you left him did you leave the wedding ring with him?

"A Well, I left it on the dresser; I just forgot it.

"Q You didn't take it. A No.

"Q When you returned— A I returned and I asked for my ring and my husband said, 'That's by Stanley.'

"Q Do you know whether or not Walter kept any other valuables at Stanley's house? A Well, that's what he told me, he have some things in Stanley's house.

"Q Some things. Did he tell you what?

"A He didn't tell me what."

Petronela Kaminska, through an interpreter, testified in part as follows:

"Q What is your name, please?

"A Petronela Kaminska.

*   *   *   *   *   *

"Q (By Miss Nolan) Do you know Josephine Barcikowski?

"A She knows.

"Q Did you know Walter Barcikowski? A Yes.

"MR. SCHURR: What was the answer?

"A Yes. She lived in his house.

*   *   *   *   *   *

"Q Did she visit with Walter Barcikowski when he was ill?

"A Yes.

"Q Where did she visit him?

"A She was once in the hospital when he was there.

"Q Does she remember when?

"A She never thought about it; she doesn't remember.

"Q Did she see Walter any time after she visited him at the hospital? A She was twice in his house after hospital when he was sick.

"Q Was he able to speak to her? A Yes.

"Q When was this, at the hospital or at home?

"A In the home. At the hospital he couldn't talk, he was after operation.

"Q Where was the home where she visited him?

"A Well, he lived—this house where he lived.

*   *   *   *   *   *

"Q What did Walter say to her at that time?

"A He was very weak at that time and he said that he give money to his son but he didn't come to visit him, but his wife takes care very much for him and she took him to the room from the restroom, she helped him to lie down and to get up because he was very big, weak, and he didn't do it by himself.

"MISS NOLAN: I see. I believe that's all.

"MR. SCHURR: I have just a couple of questions.

"CROSS EXAMINATION, by Mr. Schurr:

"Q Did Walter say how long it had been since his son had come to visit him?

"A He didn't say when. But he said that the son took everything and now he doesn't want to come to him."

Veronica Pauline Diedrich, Walter Barcikowski's daughter, testified in part as follows:

"Q Your father was a hard-working man, wasn't he?

"A He was a very hard-working man.

"Q I mean, he was a man of common means, his conduct was more or less what you would call that of a rugged man, wasn't he?

"A He was a rugged man, yes."

The trial court found that a confidential relationship existed between Walter Barcikowski and Stanley J. Barcikowski. In our opinion, this finding is not "clearly erroneous." V.A.M.R. 73.01(d); Estate of Youngblood v. Youngblood, Mo.Sup., 457 S.W.2d 750, 754.

The judgment is affirmed.

MORGAN, P. J., and FINCH, Alternate J., concur.

HENLEY, J., not sitting.