Grace Oma SKIDMORE, Plaintiff-Appellant,

v.

James T. BACK, Defendant-Respondent.

No. 9400.

Missouri Court of Appeals, Springfield District.

May 9, 1974.

Motion for Rehearing or to Transfer to Supreme Court Denied May 29, 1974.

James E. Reeves, Ward & Reeves, Caruthersville, for plaintiff-appellant.

David W. Keathley, Keathley & Little, Poplar Bluff, for defendant-respondent.

BILLINGS, Judge.

This is a suit between a sister and her brother in which plaintiff-sister sought equitable relief by way of a constructive trust against her brother-defendant. The lower court refused to grant plaintiff the requested relief and this appeal followed. A proposed opinion of this court failed of adoption and the case was re-assigned. We reverse and remand with directions.

T. W. Back was the father of plaintiff, defendant, Thomas and Albert. Following his wife's death in 1959 Mr. Back sold his farm for the approximate sum of $16,000.-00. In 1960 he set up four separate savings accounts of $4,000.00 each in a Cape Girardeau savings and loan institution with a different one of his four children designated as a joint tenant with him, with right of survivorship.

In 1964 Mr. Back purchased a house trailer and moved it to the home of his son Thomas. During 1964 the joint account of Mr. Back and Thomas was closed and the monies received therefrom were used by Thomas. In 1968 Mr. Back moved his trailer to defendant's home and during that year the joint account he had with the defendant was closed and the proceeds used to pay off the balance of the indebtedness on defendant's farm.

During March of 1971 Mr. Back was hospitalized for surgery and the remaining

two joint accounts were closed. The proceeds of these two accounts were deposited in defendant's bank account. Thereafter, plaintiff brought this suit claiming that the defendant "through the exercise of coercion, duress and undue influence . . . caused the said deposit [the joint account standing in the name of T. W. Back or Grace Skidmore] . . . to be withdrawn and delivered to defendant" and sought the imposition of a constructive trust as to these funds. Mr. Back then 97-years-old and physically incapacitated, was not made a party to the suit. He died following the trial and prior to oral argument of this case.

■ There is substantial evidence in the record that the four savings accounts were intended by Mr. Back as testamentary arrangements ["it would not have to go through Probate"], sometimes referred to as a form of "a poor man's will", and that he desired to retain the beneficial interest in each of the accounts during his lifetime. In the case of In re Estate of LaGarce, 487 S.W.2d 493 (Mo. banc 1973), our Supreme Court ruled that if there was compliance with § 369.150, RSMo 1969, V.A.M.S., in the absence of fraud, mistake, undue influence or mental incapacity, a surviving joint tenant would become the owner of the joint account even though the deceased joint tenant furnished all of the funds and retained or intended to retain the beneficial interest in the account during his lifetime—thus recognizing the statutory alternative to a will. Since there is no contention or evidence here that the creation of the four accounts by Mr. Back was in any way defective, we conclude that the joint savings accounts with his children were valid testamentary arrangements. Thus, plaintiff's interest in the joint account with her father may be properly categorized as an "expectancy" because the interest was subject to the lawful destruction at any time by Mr. Back's withdrawal of the funds on deposit. We recognize that the LaGarce case was ruled after the trial below and that LaGarce disapproved

former decisions. Nevertheless, we are required to apply the correct rule on this appeal, even though counsel and the chancellor could not have been aware of it at the time the suit was heard. Dickey v. Nations, 479 S.W.2d 208 (Mo.App.1972).

The defendant contends that plaintiff-daughter's failure to join their then 97-year-old feeble and infirm father [now deceased] as a party in this suit is fatal and forecloses a court of equity from entertaining her claim for relief; and, in any event, her "expectancy" is not subject to the protection which courts of conscience have never hesitated to afford one who has been fraudulently wronged. The facts of this case are such that we have no hesitancy in declaring the defendant a constructive trustee for the use and benefit of his sister to the extent of the funds withdrawn from the joint savings account, less any monies from such account which were in fact properly used for the support and maintenance of T. W. Back.

Prior to the withdrawal of the account in which plaintiff was a joint tenant with her father, the defendant and his brother, Tommie, had each withdrawn the savings accounts in which they were joint tenants with T. W. Back. The defendant had used the $4,000.00 he received from his joint account to pay off the indebtedness on his farm. At the time of the March, 1971, withdrawal of which plaintiff complains, the defendant also caused the withdrawal of the savings account which was in the name of his brother, Albert, and their father. The total withdrawals from the two accounts in March of 1971 amounted to $10,483.16 and defendant deposited these funds in his personal checking account—which at that time had a balance of $155.54.

According to the defendant the monies withdrawn from the two savings accounts in March of 1971 had been used for the living expenses of himself and his father but he could not produce any record or receipt of any money expended for the care,

medical bills or support of his father. Mr. Back also had a monthly income of $200.00 per month from Social Security and the Veterans Administration and defendant admitted cashing these checks and using such monies partly for his own personal benefit. In reply to the question "It doesn't cost you more than two hundred dollars a month to keep and support your father, does it?" the defendant said "No." Three weeks before the trial of this case in July of 1972 there remained $4,320.13 in defendant's personal checking account in the Bank of Campbell from the more than $10,000.00 that was derived from the two savings accounts and defendant withdrew $4,000.00 from this account and deposited such sum in a Poplar Bluff bank in a joint account in his and his son's names.

The defendant admitted that since 1968 he had completely managed and controlled his father's business and affairs and had controlled him to the exclusion of all other persons and his father depended upon him to look after him. Defendant acknowledged that his father's physical condition was bad and weak in March of 1971. He said the only business transaction that his father handled was the withdrawal of the savings accounts in March of 1971. Mr. Back was not physically able to care for himself and could not read a newspaper, according to the defendant. Since his father moved in with the defendant, the father had never failed to do anything the defendant had asked him to do and Mr. Back relied wholly on the advice and suggestions of the defendant.

Portions of defendant's deposition were received as admissions against interest and are as follows:

"Q. Now, since 1968 have you managed and conducted your father's business affairs and handled his other transactions that needed to be taken care of?

A. Yes.

Q. Has there been anybody else that has handled any business or any other transactions for him other than you or your wife?

A. No.

Q. Would you say that your father since 1968 has looked to you and your wife to take care of him and handle his affairs?

A. Yes.

Q. And he has depended on you and your wife alone to look after him, hasn't he?

A. Yes.

Q. Would you say that you advised your father as to what he should do, give him advice as to his care and treatment?

A. Yes, I tell him to turn over so that I can wash him from behind and he does it.

Q. Would you say you and your wife have actually controlled him since he moved in with you in 1968?

A. Yeah, I help control him, yes.

Q. Continuously since 1968?

A. Yes.

Q. His physical condition now is bad, isn't it?

A. Pretty bad.

Q. He is bedfast most of the time, isn't he?

A. He can get up and get a hold of the bed post and get to his chair and we watch him so he won't fall.

Q. All right. And his physical condition in March of 1971 was bad too, wasn't it?

A. When he come out of the hospital?

Q. Yes.

A. It was pretty bad, yes, his physical condition. He was weak.

Q. He was weak and how long was he weak after getting out of the hospital?

A. Well, he is still weak.

Q. Well, back in March, 1971, he couldn't handle any business transactions, could he?

A. Yes.

Q. What kind of transactions could he handle?

A. He drew that money out of the Cape Girardeau Savings.

Q. Wasn't that at your suggestion?

A. No.

Q. What other transactions did he handle in March, 1971 besides drawing these two accounts out of the bank and turning the money over to you?

A. None.

Q. Well, in March, '71 and for a period of time before and after that he wasn't capable of looking after himself, was he, Mr. Back? Your father wasn't—

A. Physically you mean?

Q. Yes.

A. No he wasn't.

Q. And that is the reason you were taking care of him is because he couldn't take care of himself, isn't that right?

A. Yes.

Q. Your father can't see well, can he?

A. Well, he can see.

Q. He can't read a newspaper even with glasses, can he?

A. No, I don't believe he can hardly read a newspaper.

Q. How long has he been in that condition?

A. He can see enough to tell time.

Q. Was he able to read anything back in March, '71, put on glasses and read a newspaper then?

A. I don't think he could.

Q. *Has your father ever failed to do anything you asked him to do since he moved in with you in 1968?*

A. *No.*

Q. *He is relying wholly on your advice and suggestions as to what he should do, isn't that true?*

A. *That is right, yes."* [emphasis added]

Mr. Back was admitted to a Poplar Bluff hospital on March 3, 1971, and underwent major surgery [transurethralectomy] for an enlarged prostate. He was released from the hospital on March 13, 1971. According to the defendant's testimony Mr. Back sent the defendant to Cape Girardeau to obtain withdrawal authorizations for the two savings accounts and both this direction to the defendant and the signing of the two withdrawal authorizations occurred *while Mr. Back was still hospitalized.* Defendant made the withdrawals on March 15, Mr. Back endorsed the two checks, and defendant deposited the funds in his personal account.

Mr. Back's physician saw him three weeks before trial and at that time Mr. Back was suffering from a chronic urinary tract infection. Mr. Back had to be brought from his car to the office in a wheelchair and lifted onto the examining table. He was unable to stand by himself and required constant surveillance and care.

Plaintiff said her father's physical condition was bad in March of 1971 and that his mind would "come and go" and he couldn't think anything "out to the end." When she attempted to discuss defendant's withdrawal of the savings accounts her father said "I can't think it through."

A requisite to imposition of a constructive trust in favor of plaintiff is that the funds in question have been acquired by fraud. Fraud in equity includes all willful or intentional acts, omissions, and concealments which involve a breach of either legal or equitable duty, a trust, or confidence, and are injurious to another or by which an undue or unconscientious advantage over another is obtained. 2 Pomeroy, Equity Jurisprudence § 873 at 1804 (4th ed. 1918). "Wherever two persons stand in such a relation that, while it continues, confidence is necessarily reposed by one, and the influence which naturally grows out of that confidence is possessed by the other, and this confidence is abused, or the influence is exerted to obtain an advantage at the expense of the confiding party, the person so availing himself of this position will not be permitted to retain the advantage, *although the transaction could not have been impeached if no such confidential relationship had existed."* 2 Pomeroy, supra, § 956 at 2040. This principle has long been established in Missouri: Where a confidential relationship exists between alleged donor and alleged donee, the purported gift is presumptively void and the burden is on the alleged donee to establish the validity of the gift. In re Estate of Barcikowski, 480 S.W.2d 877, 879 (Mo.1972); In re Patterson's Estate, 383 S.W.2d 735 (Mo.1964); Basman v. Frank, 250 S.W.2d 989 (Mo.1952); In re Kaimann's Estate, 360 Mo. 544, 229 S.W.2d 527 (1950). In such cases, the question is "whether or not trust is reposed with respect to property or business affairs of the other." Service Life Insurance Co. of Fort Worth v. Davis, 466 S.W.2d 190, 196 (Mo.App.1971). [emphasis added]

In an earlier day Lamm, J., had occasion to discuss the matter of fraud insofar as equity was concerned and his remarks in Howard v. Scott, 225 Mo. 685, 125 S.W. 1158 (1910), are worthy of review in the instant case. "In a pinch, in court or out, much is seen through a keyhole, or, put otherwise, some one illuminating fact often throws a gleam of light into the obscure corners of litigation to aid the eye of a chancellor, precisely as a flash of lightning on a dark night reveals the landscape to a bewildered traveler." 125 S.W. at 1158–1159. And, at p. 1165: "In determining the question raised it is not amiss to remind ourselves of some fundamental propositions vital to justice. It is axiomatic that fraud is odious. It vitiates everything. It is the delight and glory of a chancellor to feel for it and snatch away its fruits with a strong hand when found. Judgments of courts are not immune from it. To the contrary, more's the pity, many a heinous fraud wears the form and semblance, the fair and honest face, of an orderly procedure in courts of justice, and takes its consummation and works its iniquity under the forms of law—the imitation of solemn honesty is but a tribute vice pays to virtue. Accordingly, when fraud is charged, the piercing and discriminating eye of the chancellor looks for it high and low, whether it hide out in some everyday affair or in the judgment of a court. So, equity seeks substance, not form, in pursuit of fraud.

"What is fraud? No statute and no judge has been so daring and unwise as to define it by hard and fast rules. That pre-eminent jurist who 'perfected English Equity in to a symmetrical science,' who is deemed by no less an authority than Lord Campbell 'the most consummate judge who ever sat in the court of chancery,' Lord Chancellor Hardwicke, he who as the lad, Phillip Yorke, was designed by his pious Presbyterian mother for some 'honester trade' than the profession of an attorney (she longed to 'see his head wag in the pulpit'), who gave 'days and nights to the volumes of Addison' in acquiring a luminous and chaste style, and at the bar with unremitting toil and pains, superadded to a happy temperament and facile and receptive mind, informed and grounded himself in all essentials to wisdom, learning and virtue on the woolsack, so that his administration on that judgment seat is 'fondly

looked back upon as the golden age of equity,' laid down the precept, never since departed from, that fraud should be left undefined. In Lawley v. Hooper, 3 Atk. 278, referring to a species of fraud, he said: 'The court very wisely hath never laid down any general rule beyond which it will not go, lest other means of avoiding the equity of the court should be found out. Therefore they always determine upon the particular circumstance of each case. * * *' Elaborating that idea in a letter to Lord Kaimes, quoted by Story (1 Story, Eq. [13th Ed.] p. 200) he says: 'As to relief against frauds, no invariable rules can be established. Fraud is infinite; and were a court of equity once to lay down rules how far they would go, and no farther, in extending their relief against it, or to define strictly the species or evidence of it, the jurisdiction would be cramped and perpetually eluded by new schemes, which the fertility of man's invention would contrive.' That proposition, 'totidem verbis,' has met the approval of this court. Clyce v. Anderson, 49 Mo., loc. cit. 40. In that same case the text of Story is approved, viz., that fraud, 'in the sense of a court of equity, properly included all acts, omissions, and concealments which involve a breach of legal or equitable duty, trust, or confidence, justly reposed, and are injurious to another, or by which an undue and unconscientious advantage is taken of another.' 1 Story's Eq. (13th Ed.) § 187.''

■ Here the record is replete with overwhelming evidence of a confidential relationship between defendant and his father. Defendant had complete and continuous control over his aged parent beginning in 1968. His father had never failed to do anything defendant asked since 1968 and the elder Back relied "wholly on [defendant's] advice and suggestions as to what he should do." Furthermore, while the record does not support a contention that Mr. Back in March of 1971 was of unsound mind, nevertheless his mental and physical conditions at that time are factors for consideration on the issue of undue influence.

Davis v. Pitti, 472 S.W.2d 382, 387 (Mo. 1971).

There is very strong evidence warranting an inference of undue influence in connection with the closing of the account which stood in plaintiff's name and that of her father and at trial defendant offered no evidence to overcome the presumption that the withdrawal and subsequent gift of the bank account funds were free from undue influence. See In re Estate of Barcikowski, supra; In re Patterson's Estate, supra, and In re Kaimann's Estate, supra.

Notwithstanding the clear showing of defendant's fraud (constructive if not actual), the defendant concludes that no trust may be impressed on funds held by the defendant since there was no evidence of an intention by Mr. Back to create a trust for plaintiff's benefit. The difficulty with this conclusion is that it misconstrues the nature of a constructive trust.

■ A constructive trust arises where a person holding title to property is subject to an equitable duty to convey it to another on the ground that he would be unjustly enriched if he were permitted to retain it. Restatement of Restitution, § 160. "Where a person acquires property from another by fraud, duress or undue influence under such circumstances that a third person is entitled to restitution from the transferee, the transferee holds the property upon a constructive trust for the third person." Restatement of Restitution, § 169. As stated in Suhre v. Busch, 343 Mo. 679, 123 S.W.2d 8, 15 (1938):

"Constructive trusts do not, like express trusts and resulting trusts, 'arise by virtue of agreement or intention, either actual or implied, but by operation of law, or, more accurately, by construction of the court, regardless' and independently of any actual or presumed intention of the parties to create a trust . . . They are not technical trusts and in imposing or declaring a constructive trust a court of equity merely uses the machin-

ery of a trust to prevent fraud or provide a remedy in cases of fraud, actual or constructive, by making the person who has wrongfully acquired property, or has acquired property under such circumstances as make it inequitable for him to retain it, a trustee for the person defrauded or injured by such fraudulent of wrongful conduct. . . . [A] constructive trust is the method or formula used by a court of equity as a means of effecting restitution or rectifying a situation where, as the result of the violation of confidence or faith reposed in another, or fraudulent act or conduct of such other, the plaintiff, who seeks the aid of equity, has been wrongfully deprived of, or has lost, some title, right, equity, interest, *expectancy,* or benefit, in the property which otherwise and but for such fraudulent or wrongful act or conduct, he would have had." [emphasis added]

■ As this passage indicates, a constructive trust is available to one who has been wrongfully deprived of some "expectancy" in property which but for the wrongful conduct he would have had. In the instant case, the plaintiff's interest in the joint bank account was an expectancy, because that interest was subject to lawful destruction at any time if Mr. Back chose to appropriate any or all of the funds on deposit. We recognize that under LaGarce the joint savings accounts were valid testamentary arrangements and that Mr. Back intended to retain the beneficial interest in the joint accounts during his lifetime. However, the expectancy which plaintiff held in the account which she held jointly with her father is similar in many respects to that held by the beneficiary under a will. The interests of both can be summarily obliterated by creator of the interests: The expectancy of plaintiff is subject to withdrawal by the original depositor, Mr. Back; that of a beneficiary under a will, to revocation by the testator. Neither plaintiff nor the beneficiary need be aware of the existence of their expectancy prior

to its fruition at the death of the creator. When the beneficiary under a will is deprived of the intended disposition by the undue influence of a third person, the beneficiary is generally entitled to restitution. See Annot., 11 A.L.R.2d 808 (1950). The Restatement of Restitution, § 184 provides: "Where a disposition of property by will or intestacy is procured by fraud, duress or undue influence, the person acquiring the property holds it upon a constructive trust . . . . " *Comment a* to this section makes it applicable to the situation where a decedent is by fraud or undue influence induced to revoke a will. In such a case *Comment d* provides that the person who takes the property as a result of the revocation "holds it upon a constructive trust for the person who would have taken under the will . . . if it had not been revoked." Compare Restatement of Restitution, § 185 (Wrongfully Induced or Preventing Change of Beneficiary of Life Insurance Policy").

The foregoing analogy to the equitable protection providing restitution to one who is wrongfully deprived from taking under a will is submitted solely for illustration of what constitutes a case for a constructive trust. But contrary to defendant's position we believe that plaintiff's expectancy should be afforded the same equitable protection through the device of constructive trust as would be afforded the interest of a specific legatee. The constructive trust principle "extends to every possible case in which a fiduciary relationship exists as a fact, in which there is confidence reposed on one side and the resulting influence and superiority on the other." 2 Pomeroy, Equity Jurisprudence § 956 at 2041–42 (4th ed. 1918). "Wherever equity finds such a wrongful holding, it will give relief, whether the type of injustice is new or old. The court does not restrict itself by naming all the specific forms of inequitable holdings which will move it but rather reserves complete liberty to apply this remedy to whatever knavery human ingenuity can invent." Bogart, Trusts and Trustees

§ 471 at 10 (2d ed. 1960) (discussing constructive trusts). "A court of equity in decreeing a constructive trust is bound by no unyielding formula. The equity of the transaction must shape the measure of relief." Service Life Insurance Co. of Fort Worth v. Davis, 466 S.W.2d 190, 195 (Mo. App.1971), quoting from Cardozo, C. J., in Beatty v. Guggenheim Exploration Co., 225 N.Y. 380, 386, 122 N.E. 378, 381 (1919).

In Canada v. Daniel, 175 Mo.App. 55, 157 S.W. 1032 (1913), it was held that a *contingent* remainderman has sufficient interest to obtain restoration to a trust fund certain money alleged to have been wrongfully paid by a trustee to the defendant. The court said that the contingent beneficiary under the trust "should be allowed to prevent the destruction of that which may become his." Id. at 65, 157 S.W. at 1035. Hughes v. Neely, 332 S.W.2d 1 (Mo. 1960), is authority for a court of equity to afford relief to contingent remaindermen during the life of the life tenant and State ex rel. Cooper v. Cloyd, 461 S.W.2d 833 (Mo. banc 1971), holds that one with a contingent interest in a decedent's estate has sufficient standing to contest the probate of a decedent's will. The latter case reaffirmed Canada v. Daniel, supra, and other cases to the effect that "[a]lthough a contigent remainderman has no right to possession, he does have a protectible interest." Id. at 838. The court observed the distinction that " 'while he will not be allowed to recover damages for that which may not be his he should be allowed to prevent the destruction of that which may become his.' " Id. at 838. The Cloyd case not only illustrates the protectibility of plaintiff's interest in the present case, but also demonstrates that the defense that damages are too speculative is not efficacious where damages are not sought.

In the instant case, plaintiff does not seek damages—the effect of the constructive trust is " . . . to prevent a loss to the plaintiff and a corresponding gain to the defendant, and to put each of them in the position in which he was before the defendant acquired the property." Suhre v. Busch, supra, 123 S.W.2d at 16, quoting from *comment d* to the Restatement of Restitution, § 160. Otherwise stated, the effect of the constructive trust is normally to return the parties to the *status quo*. Had Mr. Back not died prior to this appeal, the status quo would be reached by the expedient of declaring defendant constructive trustee of the funds withdrawn from the bank account which had been held jointly by Mr. Back and plaintiff. And were Mr. Back still alive, no cause for speculation would arise since by imposing a constructive trust the possibility that Mr. Back might withdraw funds or survive plaintiff would be specifically provided for by restoring the joint bank account to its undisturbed condition. There the funds would have remained unless Mr. Back were to withdraw from the account—absent fraud, duress or undue influence—until the survivor be determined.

The sole effect of Mr. Back's death since the trial of this case is to mature plaintiff's expectancy in the joint account. It appears that an accounting is fully warranted in this case, especially since considerable time has passed since the trial of this case and Mr. Back's death renders restoration of the joint account unnecessary. Additionally, other funds [$200.00 in monthly checks and the proceeds from the account Albert had an "expectancy" in] were commingled with the monies in which plaintiff and her father were joint tenants. Compare Coffey v. Coffey, 485 S.W.2d 167 (Mo.App.1972). Plaintiff's neglect to urge an accounting is of no moment in light of the well settled doctrine " ' . . . that when a court of equity once acquires jurisdiction of a cause it will not relax its grasp upon the *res* until it shall have avoided a multiplicity of suits by doing full, adequate and complete justice between the parties.' . . . " Wallach v. Joseph, 420 S.W.2d 289, 296 (Mo.1967), cert. den., 389 U.S. 953, 88 S.

Ct. 335, 19 L.Ed.2d 362, 1 Am.Jur.2d Accounts and Accounting § 51 (accounting may be decreed in suit founded on other equitable grounds). "The equitable remedy of Account is applied whenever it is required, as a matter of course, in all cases in which equitable titles are to be protected, and equitable rights enforced; and, also, in many instances where jurisdiction has been assumed by virtue of equitable remedies . . . In [such] instances the *account* plays, as it were, a subordinate part, and is used more effectively to work out the equities which form the basis of the bill." Bispham, Principles of Equity § 479 at 756–7 (10th ed. 1923). See also 3 Scott, Trusts § 522 (1939).

In Perry v. Perry, 484 S.W.2d 257 (Mo. 1972), the former wife of a deceased insured brought an action on behalf of her children to impress a constructive trust on the proceeds of three insurance policies naming defendant as beneficiary. In that case the basis of the constructive trust was the husband's agreement, incident to his divorce from plaintiff, that he would make the couple's children beneficiaries of the policies. The agreed-to change was not carried out before the death of plaintiff's husband, and the insurance proceeds were all paid to defendant. Defendant argued that there was nothing upon which a trust could be impressed because the money had been spent for debts and living expenses and there was no possibility of following the fund into the hands of any who had received it or of tracing it into any property into which it might have been converted. The court rejected that argument, reaffirming the settled maxim that once equity has acquired jurisdiction in a matter it will not be relinquished without doing full and effective justice between the parties, "even though, to right the wrong complained of, resort must be had to a remedy within the traditional province of law, as by a judgment for money by way of restitution." Id. at 259. We are of the opinion that the instant case should be remanded to the trial court for further proceedings in the nature of an accounting as was granted in Perry v. Perry, supra, under similar circumstances. In such an accounting the defendant should be held to the test of strict accountability as enunciated by the court in Erhlich v. Lichtenfeld, 502 S.W.2d 420 (Mo.App.1973).

From what has been already said, it is clear that plaintiff is a proper party to bring this action to protect her expectancy through the means of a constructive trust. And that alone should conclusively demonstrate that there was no such defect of parties such as to preclude the plaintiff's right to maintain the action at all. Yet the defendant concludes that because the legislature has branded the interest created under § 369.150, RSMo 1969, V.A.M.S., as a joint tenancy, then that stigma renders the interests of two co-owners of the account joint for all purposes. But the defendant's analysis on the merits belies this interpretation. Furthermore, the rule of fatal non-joinder has been held to be not applicable to equitable actions.

The defendant argues that the failure of plaintiff to join her father is a matter governed by former Rule 52.04, V.A.M.R.; that all persons having a joint interest were necessary parties; that the obligation owed plaintiff and Mr. Back was a joint obligation since the statute creates a statutory joint tenancy; and that the defect was such as to preclude the plaintiff's right to maintain the cause of action in herself alone.

Former Rule 52.04 is to the same effect as § 507.030, RSMo 1969, V.A.M.S., and provides that: "[P]ersons having a joint interest shall be made parties and be joined on the same side as plaintiffs or defendants. . . ." This Rule has been construed to require joinder of all persons as plaintiffs or defendants "who have a *united* or common interest with respect to the enforcement of rights or claims *and whose presence is necessary to a complete*

*determination* of the questions involved." Buford v. Lucy, 328 S.W.2d 14, 19 (Mo. 1959) (emphasis added). Thus there are two requisites to a finding of joint interests—the first being that the interest be common or united. We are not to be blinded by the legislature's use of the phrase "joint tenants" in the statute [§ 369.150, RSMo 1969, V.A.M.S.] since the lifetime interests of plaintiff and her father are not defined by that statute. Carroll v. Hahn, 498 S.W.2d 602, 607 (Mo. App.1973). And it is uncontested in the present case that the interests of plaintiff and her father are not only distinct, but are mutually exclusive. During the father's lifetime, plaintiff acquired no present right to withdraw from the account —she had only the expectancy of the balance of the account on her father's death. The father, on the other hand, held the present right to withdraw the balance of the account during his lifetime, whether he survived plaintiff or not.

Insofar as the savings institution's obligation to plaintiff and Mr. Back was concerned its obligation was joint. But, this is a suit, not against the depositary, but against one who is charged with wrongfully inducing the withdrawal of the account and appropriating the funds to his own use. It should also be observed that defendant's present contention as to his father being a necessary party was not raised by the defendant either by motion or answer. Such failure on the part of the defendant constitutes a waiver. DeBacker v. Forbes, 406 S.W.2d 811 (Mo.App.1966); McCreary v. Employers Mutual Fire Insurance Co., 378 S.W.2d 243 (Mo.App. 1964); Casper v. Lee, 362 Mo. 927, 245 S. W.2d 132 (banc 1952). Aside from the foregoing, the fact remains that plaintiff was the real party in interest in this action to enforce her rights, or expectancy with respect to the funds derived from the joint account and a court of equity would have no difficulty in framing its decree so as to afford protection to Mr. Back.

The second element necessary to find joint interests is that the party excluded be necessary to a complete determination of the issues involved-relitigation being the evil sought to be avoided. Polette v. Williams, 456 S.W.2d 328, 332–333 (Mo.1970). While perhaps Mr. Back's joinder may have been desirable, disposition of this case by imposing a constructive trust in no way impaired any interest which Mr. Back might have. While there is evidence in the record that Mr. Back was informed about the litigation, he was understandably not called as a witness by either party. To the extent that the litigation might deprive Mr. Back of the right to dispose of his property according to his whims, that is the effect of any undue influence case. And to the extent that Mr. Back might later escape the undue influence of his son, the remedy sought—a constructive trust—would nowise prohibit him from legally withdrawing from the restored account. And because the constructive trust remedy already grants to Mr. Back (or his estate) any relief to which he might be entitled, defendant is not subjected to multiple obligations. It is true that if no undue influence were found in the present record, defendant would be subject to a second suit by Mr. Back and inconsistent judgments might result. But defendant has had a trial on the merits and under the present record no inconsistent judgments can result. A finding of fatal non-joinder only serves to supply defendant with an ill-deserved bounty for his lying-in-wait and does not comport with the purpose of Rule 52.04 to prevent repeated litigation on the same issues. Polette v. Williams, supra. This is so because inherent in a finding of non-joinder is a finding that there is someone else—Mr. Back before his death and now his estate—who is in a position to relitigate the same issues as were raised in the trial below.

Just as the defendant's contention neglects to consider the nature of the relief requested, so also does he err in his

position that there was a fatal failure to join a necessary party. The parties required to be joined are determined by the nature of the relief sought and the character of the interests adjudicated. Buford v. Lucy, supra. The nature of the relief requested—a constructive trust—is calculated to protect the interest of Mr. Back who was not joined. In fashioning a constructive trust a court of equity need not be dissuaded from styling a proper remedy to protect a deserving party when it can tailor the relief granted to protect the interests of those not joined. Thus our Supreme Court has held that the proposition urged by the defendant, that one joint obligee must join with other joint obligees in suing upon a joint obligation, is inapposite to suits of an equitable nature. Priest v. Oehler, 328 Mo. 590, 41 S.W.2d 783, 788 (1931). Perhaps this case merely holds that in equity there is no need for an inflexible rule, i. e., relief should be given whenever plaintiff's wrong may be righted without adversely impinging upon the rights of other joint obligees or subjecting a defendant to multiple liability.

Noting that former Rule 52.04 merely reiterates § 507.030, RSMo 1969, V.A.M.S., and its predecessors which were in effect when Priest v. Oehler, supra, was decided, it is difficult to apprehend how former Rule 52.04 could be construed to furnish new burdens upon a plaintiff seeking equitable relief. This is especially so since Mo.Const. Art. V, § 5, V.A.M.S., provides that the Rules "shall not change substantive rights."

The judgment of the trial court is reversed and remanded with directions to impose a constructive trust for the use and benefit of the plaintiff and for further proceedings by way of accounting, tracing, equitable lien or other tools of chancery to right the unjust enrichment to the defendant by reason of his wrongdoing.

STONE and TITUS, JJ., concur.

HOGAN, C. J., dubitante.