### The ESTATE OF Evelyn S. LINCK, Deceased.

### D.W. ARTERBURN, Administrator, Plaintiff-Appellant,

### v.

### Ruth L. CARR and Edward R. Carr, Defendants-Respondents.

### No. WD 32418.

Missouri Court of Appeals, Western District.

Nov. 16, 1982.

Motion for Rehearing and/or Transfer to Supreme Court Overruled and Denied Jan. 4, 1983.

Application to Transfer Denied Feb. 23, 1983.

David M. Rhodus (argued), Morris, Larson, King, Stamper & Bold, Kansas City, for plaintiff-appellant.

Albert Thomson (argued), Linde, Thomson, Fairchild, Langworthy, Kohn & Van Dyke, David L. Young, Sullivan & Young, Kansas City, for defendants-respondents.

Before NUGENT, P.J., and TURNAGE and LOWENSTEIN, JJ.

NUGENT, Presiding Judge.

D.W. Arterburn, administrator of the estate of Evelyn S. Linck, appeals from the judgment of the trial court which found that the joint accounts and joint certificates of deposit of Mrs. Linck and Ruth Carr, the defendant, became the sole property of Mrs. Carr upon Mrs. Linck's death. The administrator challenges Mrs. Carr's ownership on the basis that she failed to comply with the statutes relating to joint accounts, established her joint tenant status through fraud and undue influence, acquired her interest while acting as an agent, and created an invalid testamentary disposition in violation of the statute of wills. We affirm.

Evelyn S. Linck died intestate on March 5, 1977. Her sole heirs at law were two brothers, D.W. Arterburn and Samuel Homer Arterburn, one sister, Mabel Fulton,[1] and one nephew, Page Stubbs. Ruth Carr is the niece of Evelyn's deceased husband, Ed Linck. Respondent Ed Carr is Ruth's husband. Upon Mrs. Linck's death, Mrs. Carr received sole possession of $196,301.62 held in joint tenancy certificates of deposit, joint tenancy bank accounts, and joint tenancy checking accounts. Mrs. Carr established most of these accounts herself with a power of attorney executed by Mrs. Linck on September 22, 1976.

In January of 1976, Mrs. Linck underwent surgery for breast cancer. In August of that year she lost coordination in her right hand, and asked Mrs. Carr to help her with her check writing. For this purpose,

---

1. Before trial, Mabel Fulton died, leaving as her heirs Dorothy Herndon and William P. Fulton.

Mrs. Linck had Mrs. Carr's name added to Mrs. Linck's checking account at Red Bridge Mercantile Bank on September 1. Mrs. Carr made deposits and wrote checks for the payment of Mrs. Linck's bills until Mrs. Linck's death. She did not use the account for her own benefit except for a check for a Christmas gift Mrs. Linck directed her to write.

On September 18 doctors informed Mrs. Linck that she had inoperable brain tumors and admitted her to the hospital. During this hospital stay, Mrs. Linck told Mrs. Carr that she had no will but intended to make one when she was released from the hospital. She expressed her intention to leave all of her property to Mrs. Carr as well as her desire immediately to put Mrs. Carr's name on her savings accounts and certificates of deposit. She also told Mrs. Carr where the keys to her safety deposit boxes were to give her access to the certificates of deposit and instructed her to put her name on the boxes as well. She did so with a power of attorney, executed on September 22, which she marked with an "X" in the presence of two hospital witnesses and acknowledged before the hospital notary.

After Mrs. Linck's death, Mr. Arterburn filed a petition against Mr. and Mrs. Carr for determination of title and right of possession of assets and for damages. In Count I the administrator alleged that "[o]n September 22, 1976, Evelyn S. Linck as principal executed a written power of attorney naming Ruth L. Carr as her agent . . . ." Mrs. Carr's answer admitted the allegation. The petition then alleged that "[f]rom and after September 1, 1976, Ruth L. Carr used her authority and position as agent and confidant of Evelyn S. Linck to receive, transfer, disburse and otherwise deal with property belonging to Evelyn S. Linck." Paragraph 27 alleged that:

By reason of the foregoing acts and conduct of Ruth L. Carr, she became the agent and confidant of Evelyn S. Linck with respect to the foregoing property and transactions and Ruth L. Carr as agent, has breached her duties and obligations to receive, hold and deal with the aforesaid property solely for the benefit of Evelyn S. Linck as principal and she has breached her duty and obligation not to deal with said property on her own account or to her own advantage and benefit.

The administrator prayed for judgment that the Carrs held the property in trust for the plaintiff, damages in the amount equal to the value of the Linck property and an order enjoining the Carrs from using the property contrary to the plaintiff's interest.

Count II alleged that the Carrs wrongfully and unlawfully came into possession of the $196,301.62 and "unlawfully converted the same to their own use". The administrator prayed for the return of the property and interest "from the date of the unlawful conversion."

In Count III the administrator alleged that Mrs. Carr entered into a confidential relationship with Mrs. Linck in August, 1976. He claimed that after she entered the hospital on September 18, 1976, Mrs. Linck "was incapacitated and, in general, incapable of attending to her personal and financial affairs and was attended upon by defendant, Ruth L. Carr." He further alleged:

3. That, during her hospitalization, Evelyn S. Linck was so confined, sick, ill and infirmed that defendant coerced, influenced and caused her to execute and deliver to defendant the aforesaid power of attorney and to inform defendant of the location and extent of her personal estate.

4. That said power of attorney was obtained fraudulently and without any consideration and as the direct result of the undue influence exercised by defendant over Evelyn S. Linck while she was in the condition hereinabove mentioned and while defendant was in a confidential relationship with her.

The evidence at the trial indicated that Mrs. Linck was close to the Linck family and particularly close to Mrs. Carr. Mrs. Linck asked Mrs. Carr to write out her checks and balance the checkbook under Mrs. Linck's supervision. Mrs. Carr took

her shopping and to lunch. Mrs. Carr took her to the hospital in September, ran her errands, picked up her mail, and checked on her house. Mrs. Carr visited her frequently at the hospital and at John Knox Village, where Mrs. Linck was admitted for radiotherapy after the diagnosis of brain cancer.

On several occasions, Mrs. Linck expressed her desire that Mrs. Carr receive her assets. She stated that she considered Mrs. Carr to be a daughter to her. She resisted writing a will and stated that she "wouldn't leave [her] brothers anything more than a dollar." Moreover, at Mrs. Linck's request and direction Mrs. Carr added her name to the accounts and certificates of deposit.

In his findings of fact, the trial judge found that on September 22, 1976, Mrs. Linck was mentally competent to deal with her property; that her free choice was not destroyed by Mrs. Carr's influence on September 1 or September 22, 1976; that Mrs. Carr did not enter into a confidential relationship with Mrs. Linck until September 22, 1976; that Mrs. Linck's desire was that her bank accounts and certificates of deposit be put in joint names with Mrs. Carr so that the survivor would own them; and that Mrs. Carr's testimony was uncontradicted that she followed Mrs. Linck's directions in establishing the joint accounts and joint certificates of deposit.

In his conclusions of law the trial judge held that the administrator failed to meet his burden to prove both that Mrs. Carr destroyed Mrs. Linck's free choice and that Mrs. Linck was incompetent on September 1 or September 22, 1976. Therefore, the joint accounts and joint certificates of deposit were the sole property of Mrs. Carr.

■ On appeal the administrator argues for reversal in seven convoluted and confusing points. The standard of review set forth in *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo.1976) (en banc), requires that we affirm the trial court's ruling unless no substantial evidence appears to support it, it is against the weight of the evidence, or it erroneously declares or applies the law. The burden of proving the judgment below erroneous lies with the appellant.

### POINT I

The administrator contends that the judgment is not supported by substantial evidence because (1) Mrs. Carr failed to establish compliance with §§ 362.470,[2] joint deposits (in banks and trust companies), or 369.150, joint tenants' accounts (in savings and loan associations),[3] (2) even if she did

---

**2.** All sectional references are to Revised Statutes of Missouri, 1969, unless otherwise indicated.

**3.** We note that, although § 362.470 was revised in 1977 thus making the 1969 statute the effective statute in this case, § 369.150, relied on by the administrator, was repealed in 1971 and replaced with § 369.174 that same year.

Before revision, § 362.470 (joint deposits) stated in relevant part that:

When a deposit is made by any person in the name of the depositor and any one or more other persons, whether minor or adult, and in form to be paid to any one or more of them, or the survivor or survivors of them, the deposit thereupon and any additions thereto made by any of these persons, upon the making thereof, shall become the property of these persons as joint tenants, and the same, together with all interest thereon, shall be held for the exclusive use of the persons so named, and may be paid to any of them, or to the survivor or survivors of them. . . .

Similarly, § 369.174, R.S.Mo.1978, (joint tenants' accounts, how handled) provides that:

1. When a savings account is opened or maintained in an association in the names of two or more persons, whether minor or adults, as joint tenants or in form to be paid to any of them or the survivors of them and whether or not the names are stated in the conjunctive or the disjunctive or otherwise, the savings account and all additions thereto shall be the property of such persons as joint tenants. The moneys in the account and all earnings on the account may be paid to any one of such persons during his lifetime or to any of the survivors of them after the death of any one or more of them. The opening or maintenance of the account in such form, in the absence of fraud or undue influence, shall be conclusive evidence in any action or proceeding to which either the association or any survivor is a party of the intention of all the parties to the account to vest title to the account and the additions and earnings thereto in the survivor.

comply with the statutes, her joint tenant status was established through fraud and undue influence as a matter of law, and (3) the evidence shows Mrs. Carr acquired her interest in the property while acting as an agent.

■ We note first that the statutes cited by the administrator require no more than that the account be opened or maintained in the names of two or more persons as joint tenants or in the form to be paid to any of them or the survivors. This Mrs. Carr did. The checking accounts were payable to either Mrs. Linck or Mrs. Carr as "joint tenants with right of survivorship", the certificates of deposit were payable to either or survivor, and the savings certificates were also joint accounts. Neither statute excepts accounts opened by a power of attorney, and the administrator cites no authority which imposes such an exception.

The legal effect of compliance with these statutes was the subject of *In re Estate of LaGarce,* 487 S.W.2d 493 (Mo.1972) (en banc). In that case, the decedent had transferred his accounts into joint tenancy with his friends James and Leona Mouldon so that they might have the assets on his death. Even though the evidence suggested that he changed his mind and intended to transfer the ownership into his wife's name but was prevented from doing so by his infirmity and eventual death, the Supreme Court found the Mouldons to be the rightful owners. The court specifically overruled earlier cases which had applied common-law principles of intervivos gifts to accounts held in joint tenancy, and said at 500–01:

> It is our view that the statute creates what might be described as a statutory joint tenancy which should be given effect without consideration of the strict common-law requirements mentioned in

the cases. . . . *[I]f the statute is complied with, in the absence of fraud, undue influence, mental incapacity, or mistake, the survivor will become the owner of the account.* Depositors have a right to expect the statute to be enforced according to its plain language (emphasis added).

Therefore, when Mrs. Carr complied with the statutes by creating these additional joint accounts and joint savings certificates pursuant to specific directions of Mrs. Linck, she and Mrs. Linck became joint tenants.

The administrator apparently argues nevertheless that the defendant exerted undue influence in the creation of the joint tenancies, and she therefore falls within the exceptions created in *LaGarce* for "fraud, undue influence, mental incapacity or mistake".[4]

■ In order to establish a presumption of undue influence, plaintiff must show (1) a fiduciary relationship and (2) some additional evidence from which undue influence may be inferred. *Obermoeller v. Speck,* 544 S.W.2d 21 (Mo.App.1976). The facts in that case, in which the court did not find undue influence, are remarkably similar to those before us. The decedent's daughter, Delores, who was closer to him than were his other children, assisted her father in a number of ways in his final illness. At his request, she enabled him to transfer his assets to savings accounts held in joint tenancy with her. The court found that because the evidence showed that Delores was more devoted to her father than were the other children, the natural conclusion arose that he was motivated by a genuine preference for her and not by undue influence.

■ Similarly, here we have a fiduciary relationship as a result of the power of attorney.[5] As to the necessary second ele-

---

**4.** Plaintiff cites *Dietz v. Humphreys,* 507 S.W.2d 389 (Mo.1974), as suggesting that in addition to the grounds listed in *LaGarce,* breach of a confidential relationship may be used to defeat the claims of a surviving joint tenant. Quite the contrary, the court in *Dietz* remanded the case so that plaintiffs could revise their pleadings to be consistent with the

*LaGarce* decision, handed down after the trial was held.

**5.** No power of attorney existed when the joint checking account was established. Any fiduciary relationship here existed only in relation to the joint tenancies in savings accounts and savings certificates.

ment, however, the trial court found that the evidence "wholly fails" to show that Mrs. Carr's influence destroyed the free choice of the decedent. No evidence whatsoever indicated that Mrs. Linck was coerced or forced to execute the power of attorney or to establish the joint checking accounts. On the contrary, the testimony that Mrs. Linck executed the power of attorney of her own free will stands unimpeached. Nor did the administrator controvert the evidence that Mrs. Linck suggested that the checking account be made joint. The administrator's witnesses testified that Mrs. Linck was sufficiently lucid to write a will on February 20, 1977, and that she had undergone no personality changes. The nurse at Research Medical Center testified that she never felt that Mrs. Linck was confused. None of the witnesses knew of any attempt by Mrs. Carr to influence Mrs. Linck in her financial affairs. Most important, the facts demonstrate that Mrs. Carr took the time to visit Mrs. Linck and help her handle her personal and, to a limited extent, her financial affairs. We believe that the evidence supports the conclusion that Mrs. Linck directed Mrs. Carr to add her name as a joint tenant to the accounts because of a genuine preference for her and not as a result of undue influence.[6]

 As to plaintiff's final argument within point I that Mrs. Carr violated her duties as an agent by creating the joint tenancy accounts at the direction of Mrs. Linck, we cannot agree. The administrator relies on the principle that an agent is duty-bound to show the proper disposition of any property coming into her hand by virtue of the agency, citing *Estate of Stickler,* 551 S.W.2d 944 (Mo.App.1977), as a "highly analogous" case. In that case, however, the evidence showed that the agent's actions were contrary to the wishes of the deceased, who had written in a letter, "I think Adeline [the agent] has tricked me out of all my estate." Here, the testimony of defendant and her witnesses repeatedly reinforces the finding that she acted entirely according to Mrs. Linck's wishes. Contrary to the administrator's contention, a *refusal* to follow Mrs. Linck's directions would have constituted a violation of the agent's duty. On this point, the administrator is simply quarreling with the trial court's assessment of the facts. Moreover, as the trial court in *Obermoeller v. Speck, supra,* stated in its memorandum opinion, quoted at 23–24 n. 2:

> It is preposterous to postulate a proposition wherein a favorite child of a parent could not obey the wishes and desires of that parent relative to the latter's disposition of his property without becoming suspect, or being called upon under threat of pernicious mischief and nefarious activity to advance a complete stranger to do the bidding of the father just in order to escape the accusations. This is not the law, nor should it be the law.

Accordingly, we find that Mrs. Carr did comply with the statutes relative to the creation of joint tenancy accounts, that the evidence supports the finding that no undue influence was involved, and that Mrs. Carr has shown that she acted in compliance with her duties as an agent.

---

**6.** The administrator mistakenly relies on *Skidmore v. Back,* 512 S.W.2d 223 (Mo.App.1974), and *In re Estate of Patterson,* 383 S.W.2d 735 (Mo.1964), to support his theory that the transfers are presumptively void. The constructive trust imposed in *Skidmore* resulted from a finding of actual fraud by a son in transferring his father's assets from accounts intended for other children to accounts in the son's name. That holding is consistent with the *LaGarce* precepts discussed above. Other language in *Skidmore* at 229 and in *Patterson* at 738 that when a confidential relationship exists, a purported gift is presumptively void is contradicted by *LaGarce,* at least when those gifts are in the form of an account held in joint tenancy. The presumption is now quite the contrary in the absence of fraud, undue influence, mental incapacity or mistake. *LaGarce,* 487 S.W.2d at 501.

Even if we were to consider the transfers here presumptively void, however, the cases cited by plaintiff do not make such a presumption irrebuttable, but state that the burden is on the donee to establish the validity of the gift. As we show in our discussion as to the defendant's agency, *infra,* defendant has adequately shown that she acted according to Mrs. Linck's wishes and therefore, did make a proper disposition.

## POINTS II AND III

In these points, the administrator complains that the trial court erred in declaring as conclusions of law that the burden was on the estate to prove both that Mrs. Linck was incompetent and that Mrs. Carr unduly influenced her because when he made a prima facie case that Mrs. Carr acquired an interest in Mrs. Linck's property while acting as an agent, the burden shifted to Mrs. Carr to show that she made a proper disposition in accordance with her agency duties.

The administrator is incorrect.

■ As we noted in discussion of point I, Mrs. Carr did present competent evidence that while acting as Mrs. Linck's agent, she made proper disposition of her property. Therefore, the burden which plaintiff argues that Mrs. Carr must meet has been met. If plaintiff wished to rebut that showing at trial, he had the burden of establishing any impropriety. As stated in *McCloskey v. Koplar,* 329 Mo. 527, 46 S.W.2d 557, 563 (1932) (en banc),

> the "burden of evidence" is the burden of "getting by" the judge to the jury, by making a prima facie showing as to each factual ingredient necessary to establish a prima facie case. Having done this, a plaintiff has discharged his burden of evidence, and the burden shifts to the defendant to produce, if he desires, competent controverting evidence which, if believed, will offset the plaintiff's prima facie case. *If this is done the defendant has met the burden of evidence cast upon him, and made a prima facie defense, whereupon the burden swings back to the plaintiff to bring forward evidence in rebuttal,* and so on (emphasis added).

■ Plaintiff put undue influence at issue when he alleged in his petition that "defendant coerced, influenced and caused her [Mrs. Linck] to execute . . . the . . . power of attorney" and that the power of attorney was obtained "as the direct result of the undue influence exercised by defendant over Evelyn S. Linck . . . ." Although plaintiff now contends that Mrs. Linck's competence was not an issue at trial, substantial evidence was introduced on the subject, apparently in response to plaintiff's allegation in his petition that "during her hospitalization, Evelyn S. Linck was incapacitated and, in general, incapable of attending to her personal and financial affairs and was attended upon by defendant, Ruth L. Carr." The trial court appears to have reached the reasonable conclusion that this allegation was made to suggest that Mrs. Carr was in a position to take advantage of Mrs. Linck, an issue obviously relating to the propriety of her acts as an agent. Once raised by plaintiff the burden of proof on those issues was his.

## POINT IV

The trial court found as a fact that no confidential relationship existed between Mrs. Linck and Mrs. Carr until September 22, 1976. In his first conclusion of law, the trial judge found that "[t]he evidence wholly fails to show either a confidential relationship or influence of Mrs. Carr which destroyed the free choice of Mrs. Linck." In point IV, the administrator complains that the trial court erred in that conclusion because the administrator had made a prima facie case showing a confidential relationship when he established the fact that a power of attorney existed.

■ A careful reading of the conclusions of law in light of the court's findings of fact necessarily leads to our construction that what the trial court meant in that conclusion of law was that no evidence was adduced to show the destruction of Mrs. Linck's free choice *by reason of* the creation of the confidential relationship *or by reason of* any influence upon Mrs. Linck. Thus read, the conclusion of law is reconciled with the earlier finding of fact. At a minimum, the learned trial judge is entitled to a reasonable construction of his findings and conclusions. The administrator's construction of the first conclusion of law distorts the trial court's meaning by disregarding the words "which destroyed the free choice of Mrs. Linck".

## POINT V

Point V, without benefit of supporting authority, makes yet another complaint regarding the trial judge's finding of fact that no confidential relationship existed between the two women before September 22, 1976. The trial court found that prior to that date "Mrs. Carr acted only as a writer of checks for Mrs. Linck at Mrs. Linck's direction . . . ." The administrator argues that Mrs. Carr had the ability and authority to act unilaterally with respect to Mrs. Linck's checking accounts, thus creating "the obvious agency relationship and the necessary duties which arise . . . ."

■ We do not agree. The mere ability to act so as to affect Mrs. Linck's property arising from the creation of a joint account did not create an agency relationship between the cotenants. *Heffner v. White,* 113 Ind.App. 296, 45 N.E.2d 342, 346 (1942); 20 Am.Jur.2d *Cotenancy and Joint Ownership* § 2 (1965). *See also Land Clearance for Redevelopment Authority v. Dunn,* 416 S.W.2d 948, 953 (Mo.1967). No other evidence of the creation of an agency or grant of authority to Mrs. Carr before September 22 was adduced.

## POINT VI

■ The administrator contends that if Mrs. Carr was acting under the direction of Mrs. Linck to establish the joint tenancies, the directions constitute an invalid testamentary disposition because the power of attorney fails to comply with § 474.320 dealing with the form, execution and attestation of wills. This argument is controlled by *LaGarce, supra,* and must be rejected. The court specifically held at 500–01:

> Upon the death of the depositor who furnished the money, we cannot see any reason why the surviving joint tenant should not be held to be the owner of the deposit even though the donor may have intended to retain the beneficial interest in the account during his lifetime. It is true that such an arrangement is somewhat of a testamentary nature, but *we see no reason why the statute of wills should prevail over equally valid statutes relating to deposits in banks and savings and loan institutions.* As indicated in 21 Journal of the Missouri Bar 394, "ANOTHER VIEW OF JOINT BANK ACCOUNTS", by Charles B. Blackmar, the courts have approved a number of arrangements with testamentary purposes which transfer money and property without the use of a will (emphasis added).

We hold, therefore, that although "somewhat testamentary [in] nature", the joint tenancy accounts in this case are not rendered invalid as a result.[7]

## POINT VII

■ The administrator argues in point VII with respect to the saving certificates and checking account that "Ruth had the burden of establishing her status as a joint tenant with right of survivorship and she failed to offer evidence of the nature of the claimed joint tenancy contract under which she claimed this property." We are not certain what is meant by this argument. If plaintiff means simply that Mrs. Carr failed to prove the *creation* of the joint tenancies by production of the bank account records or the saving certificates, the answer is equally simple: the parties did not dispute the existence and the creation of the joint bank accounts. They averred and admitted the creation and existence of both in their respective pleadings and evidence. The mere existence of these joint tenancies was never in dispute, and proof of those facts was unnecessary. *Ried v. City of Maplewood,* 598 S.W.2d 171, 173 (Mo.App.1980).

■ If, on the other hand, the administrator means that Mrs. Carr had the burden

---

7. Because we are dealing with joint accounts in this case, the case to which plaintiff refers us, *In re Estate of Simms,* 423 S.W.2d 758 (Mo. 1968), does not apply. In *Simms,* the accounts created were in the form of trustee accounts, and were held not to constitute valid testamentary disposition of the assets contained in them. The presumption of ownership in the survivor decreed by *LaGarce* was applied only to accounts held in joint tenancy and thus *Simms* is distinguishable.

of proving her right to survivorship as a joint tenant with respect to this property by showing the trier of fact that an arrangement, agreement or contract existed between her and Mrs. Linck to set up such a joint account, then he must fail because he has cited no authority for the proposition that, in order to reap the benefits of survival, a joint tenant in any case must prove any more than the proper creation of the joint tenancy. No other agreement is necessary.

Finally, in oral argument, the administrator cited the recent Eastern District case, *Mercantile Trust Co., N.A. v. Harper,* 622 S.W.2d 345 (Mo.App.1981), as grounds for invalidating Mrs. Carr's power of attorney. In that case the executor alleged that two of the defendants, Judith Harper and her husband Robert, had acquired and converted the deceased's property by use of a power of attorney that was totally void. "The central issue ... is whether the general power of attorney executed by Mr. Mandle and given to Judith was sufficient investment of authority for a joint account to be opened by Paine, Webber [a stock brokerage firm] at Judith's behest." *Id.* at 349. The court stated that all-encompassing grants of power to an agent must be discounted, and held that language providing that Judith could "perform any act ... that I now have, or may hereafter acquire the legal right ... to ... perform, in connection with ... any ... item, transaction ... or matter whatsoever" did not empower her to sell or transfer an owner's securities, because a power of attorney must state explicitly its subject matter and purpose.

The *Harper* case is distinguishable, however, in that while the power of attorney before us does generally grant Mrs. Carr the power to "perform all acts ... whatsoever concerning my property," it specifically grants authority to perform acts relating to personal property and banking. Moreover, the record clearly shows that Mrs. Linck's purpose in creating the power of attorney was, at least in part, to enable Mrs. Carr to create the joint accounts. The general power of attorney granted to create the joint accounts was sufficient authority.

The record supports the findings, conclusions and judgment of the trial court. We hold that the joint tenancy accounts were created in compliance with the statutes, that the administrator failed to adduce evidence from which a presumption of undue influence or fraud could be drawn, that Mrs. Carr has shown that she acted in compliance with her duties as an agent, and that the disposition of the property by the creation of joint accounts was not an improper testamentary disposition.

Accordingly, we affirm the judgment.

All concur.